# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 1:20-cv-23242-BB

UNITED STATES OF AMERICA *ex rel*. SEDONA
PARTNERS LLC,

           Plaintiff,

    vs.

ABLE MOVING & STORAGE, INC.; ARPIN
INTERNATIONAL GROUP, INC.; CARTWRIGHT
INTERNATIONAL VAN LINES, INC.; COLEMAN
AMERICAN MOVING SERVICES, INC.; DEWITT
COMPANIES LIMITED, LLC; HILLDRUP
COMPANIES, INC.; J.K. MOVING & STORAGE
INC.; NEW WORLD INTERNATIONAL, LTD.;
PARAMOUNT TRANSPORTATION SYSTEMS;
PAXTON VAN LINES, INC.; AND WESTERN
EXPRESS FORWARDING, LLC,

           Defendants.

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES
FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................................3

II.   JURISDICTION AND VENUE....................................................................................5

III.  PARTIES ....................................................................................................................5

    A.    Plaintiff..............................................................................................................5

    B.    Defendants.........................................................................................................5

IV.   BACKGROUND.........................................................................................................8

    A.    The Merchant Marine Act of 1936, the Cargo Preference Act of 1954,
        and corresponding regulations.............................................................................8

    B.    The Federal Centralized Household Goods Traffic Management Program
        ("CHAMP")........................................................................................................9

            1.    Request for Offers ("RFOs") and the bidding process. .............................10

            2.    Certified waivers for using foreign flag vessels.........................................11

            3.    U.S. General Services Administration's Household Goods Tender of
                Services ("HTOS")......................................................................................13

            4.    Penalties ....................................................................................................15

V.    OVERVIEW OF THE SCHEME.................................................................................15

    A.    Part One of the Scheme:  The submission of the low-ball bids.............................16

    B.    Part Two of the Scheme:  Submission of fraudulent flag waivers. ........................21

    C.    Further evidence shows that Defendants abandoned the scheme for fear of
        DOS uncovering the fraud...................................................................................22

VI.   CAUSES OF ACTION.................................................................................................25

    FIRST CAUSE OF ACTION ON BEHALF OF THE UNITED STATES
    VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT PRESENTING
    FALSE CLAIMS, AGAINST ALL DEFENDANTS (31 U.S.C. § 3729(a)(1)(A)).........25

    SECOND CAUSE OF ACTION ON BEHALF OF THE UNITED STATES
    VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT MAKING OR USING

FALSE RECORDS OR STATEMENTS MATERIAL TO PAYMENT OR
APPROVAL OF FALSE CLAIMS, AGAINST ALL DEFENDANTS
(31 U.S.C. § 3729(a)(1)(B)) ............................................................................................26

VII.    PRAYER FOR RELIEF ............................................................................................27

VIII.   DEMAND FOR JURY TRIAL...................................................................................28

Plaintiff UNITED STATES OF AMERICA ("United States"), by and through Relator Sedona Partners LLC, alleges as follows:

## I.     INTRODUCTION

1.     Relator Sedona Partners LLC brings this action on behalf of the United States to recover damages as a result of the submission by Defendants ABLE MOVING & STORAGE, INC.; ARPIN INTERNATIONAL GROUP, INC.; CARTWRIGHT INTERNATIONAL VAN LINES, INC.; COLEMAN AMERICAN MOVING SERVICES, INC.; DEWITT COMPANIES LIMITED, LLC; HILLDRUP COMPANIES, INC.; J.K. MOVING & STORAGE INC.; NEW WORLD INTERNATIONAL, LTD.; PARAMOUNT TRANSPORTATION SYSTEMS; PAXTON VAN LINES, INC.; and, WESTERN EXPRESS FORWARDING, LLC (collectively "Defendants") of thousands of fraudulent bids to obtain shipping contracts through the United States Department of State ("DOS") under the supervision and guidance of the United States General Services Administration ("GSA").

2.     Many federal civilian offices pay for and assist their employees and families in relocating and moving their belongings through a GSA program—the Centralized Household Goods Traffic Management Program ("CHAMP").  Private shipping companies, referred to as "Transportation Service Providers" ("TSPs") participate in the CHAMP program and compete for shipping contract awards.  In providing these shipping services, participants are subject to various strict guidelines and requirements that are overseen and set forth in DOS, GSA, and federal laws and regulations.  One of the key requirements TSPs must follow is the "America-First" policy, which is based on federal maritime and cargo laws.  This policy requires that the companies use, and work with, "U.S. flag vessels" (American shipping carriers), except in unique circumstances where a waiver is obtained for use of a "foreign flag vessel."  Foreign flag vessels are much cheaper than American carriers, and do not follow U.S. laws and customs.  For example, U.S. flag carriers are required to have U.S. Citizen crews and pay payroll taxes, and crew members pay U.S. income

taxes.  U.S. flag carriers are subject to Coast Guard regulations and environmental regulations, and U.S. flag carrier ships must be built (with some exceptions) and repaired in U.S. shipyards.

3.      This "America-First" policy has been in place for decades and is codified in multiple federal statutes, regulations, and guidelines.

4.      With 225 embassies and consulates around the world, DOS uses this program thousands of times per year to relocate DOS employees by shipping their belongings both domestically and internationally.

5.      From 2008 through 2018, Defendant TSPs carried-out a fraudulent scheme wherein hundreds of millions of dollars were illegally taken from taxpayers, American workers, and American companies because foreign flag vessels were routinely and illegally used by the TSPs, instead of U.S. flag vessels.

6.      The scheme was carried out through two false submissions to the government: First, Defendant TSPs submitted fraudulent low-ball bids in order to capture awards for the very competitive shipping routes, referred to as "lanes," across international waters.

7.      Second, in order to profit on their low-ball bids, Defendant TSPs submitted thousands of false foreign flag waivers, requesting permission to use lower costing foreign flag vessels, by fraudulently certifying that no U.S. flag vessels were available to carry-out shipments and/or that a foreign flag vessel was necessary to meet delivery requirements.

8.      Defendants knowingly submitted theses fraudulent waiver requests, because they knew that at that time DOS did not have the resources to audit every waiver request.  These waivers were routinely granted to Defendants, resulting in hundreds of millions of dollars going to foreign companies instead of American companies.

9.      Law abiding American businesses, which federal law prioritizes, have been locked out of shipping lane contracts because of this fraudulent scheme.  Not only did the conduct hurt the America-First policy, it also resulted in violation of numerous federal laws and guidelines as well as GSA contractual terms, policies, and waiver requirements.  Only recently, upon DOS

reemphasizing the US flag vessel requirements, have some Defendants stopped the fraudulent practice, as evidenced by their dramatically increased rates.

## II.   JURISDICTION AND VENUE

10.    This Court has jurisdiction over the claims raised in this Complaint under 31 U.S.C. § 3730(b) and 3732(a) which confer jurisdiction on this Court for actions brought under the federal False Claims Act and authorize nationwide service of process.

11.    Venue is proper under 31 U.S.C. § 3732(a), as Defendants transacted business and engaged in the conduct alleged in this District, where a key DOS dispatch agency is located. Further, Defendants arranged many of the shipments and provided documentation to DOS related to their services in this District.

## III.   PARTIES

### A.    Plaintiff

12.    Plaintiff in this action is the United States of America, by and through Relator Sedona Partners LLC.

13.    Relator is an insider in the TSP business and has direct and independent knowledge of the information on which these allegations are based.  Relator voluntarily provided the information contained in this Complaint to the government in advance of filing.

### B.    Defendants

14.    Able Moving & Storage Inc. ("Able") is based in Manassas, Virginia and was incorporated in 1987 under the laws of Virginia. Able provides international and domestic shipping and prides itself for its frequently awarded contracts from the Department of State. Able is the fastest growing moving company in the Mid-Atlantic, with most of its growth coming from the international division. It accumulates about $50 million in annual revenue.

15.    Arpin International Group, Inc. ("Arpin") provides household goods moving and storage services. Arpin is based in West Warwick, Rhode Island and was incorporated under the

laws of Rhode Island.  The Company offers international moving and handles approximately 14,000 GSA and military relocations per year.

16.     Defendant Cartwright International Van Lines, Inc. ("Cartwright") provides transportation and logistics services. It is based in Grandview, Missouri and was incorporated under the laws of Missouri. The Company offers domestic and international residential and military household goods moving, relocation services, global logistics, freight forwarding, and mobility solutions.  Cartwright is the leading provider of United States military moving services.

17.     Defendant Coleman American Moving Services ("Coleman") is headquartered in Midland City, Alabama and incorporated in 1960. The company offers both domestic and international moving services.  Over the years, it has handled over 12,000 corporate and government transfers from all over the world.  It is among the top five privately owned van lines with offices and representatives in 175 countries, and 47 allied branded locations.

18.     Defendant DeWitt Companies Limited, LLC ("DeWitt") has been providing domestic and international relocation moving services of household goods to the GSA and the DOS since 2012.  It began operations in San Diego, California, where it is headquartered, and was incorporated under California law in 2002.  It is an approved TSP and available through GSA's CHAMP.  DeWitt completes global moves for 5,000 customers annually and operates in over 100 countries.

19.     Defendant Hilldrup Companies, Inc. ("Hilldrup") provides trucking services and corporate and residential moving services, such as lump sum programs, relocation assistance, storage, and automobile transportation services.  Hilldrup is based in Stafford, Virginia, was incorporated under the laws of Virginia, and is a stockholding representative of UniGroup, a $1.7 billion transportation and relocation services company.  Hilldrup provides moving services internationally, and has provided employee relocation services to the United States government for over 70 years.  Hilldrup advertises participating in GSA's CHAMP program, noting it offers highly competitive rates for relocating federal employees.  Hilldrup also works with the

Department of Defense and claims to be both GSA and Department of Defense approved to provide relocation services internationally.

20.     Defendant JK Moving & Storage, Inc. ("JK Moving") provides residential, commercial, and international moving services. JK Moving is based in Sterling, Virginia and was incorporated under the laws of Virginia. The Company offers moving trucks, storage services, and management teams, and advertises international and employee relocation services. JK Moving promotes its international services by touting affiliation with FIDI, IAM, and OMNI. JK Moving recently was awarded a $175,000 contract by the DOJ.

21.     Defendant New World International, Ltd. ("New World") is headquartered in Chicago, Illinois and was incorporated in 1986. The company offers international services with regional coordination offices which work with an extensive network of service partners in 150 countries and 18 main locations, as well as an affiliated service center in Orlando, Florida. New World promotes its international services by touting affiliation with FIDI and other associations.

22.     Defendant Paramount Transportation Systems ("Paramount") claims to be a leading provider of global moving services with strategically located operational facilities and customer service centers throughout the United States, Canada, Asia and Europe. Paramount specializes in the movement of household goods, personal effects, vehicles and pets for employees of multi-national and Fortune 500 corporations, as well as working with agencies within the United States government. As a licensed global freight forwarder, Paramount manages almost 45,000 shipments annually, touching more than 170 countries.

23.     Defendant Paxton Van Lines, Inc. ("Paxton") offers logistics, freight forwarding, warehousing, distribution, brokerage, and cargo services. It is headquartered in Springfield, Virginia and was incorporated under the laws of Virginia. Paxton Van Lines, Inc. operates worldwide as Paxton Companies, which includes the Paxton International division. Paxton International advertises more than 40 years of freight forwarding and international export experience, with offices in Afghanistan and Iraq. Paxton advertises that it has FIDI affiliation and

FAIM certification.  Paxton has been awarded $1.7 million in combined obligations of all task orders under GSA contract GS33F0004S for movement of employee household goods.

24.      Defendant Western Express Forwarding, LLC ("Western Express") is based in Marlboro, Maryland, just a few miles from the capital building.  It provides international and domestic moving services, primarily focusing on military personnel moves.  Western Express is an approved carrier for DOS and GSA.

## IV.    BACKGROUND

### A.     The Merchant Marine Act of 1936, the Cargo Preference Act of 1954, and corresponding regulations

25.      The Merchant Marine Act of 1936 provides the GSA authority to set forth regulations requiring agencies not to pay or reimburse an officer or employee for travel or transportation expenses associated with a foreign vessel, unless documentation indicates the necessity to do so.  *See* 46 U.S.C. § 55302(b).

26.      The Cargo Preference Act of 1954 requires that:  "at least 50 percent of the gross tonnage of all Government generated cargo -- meaning cargoes procured, furnished, or financed by the United States Government -- shall be transported on privately owned, U.S.-flag commercial vessels to the extent such vessels are available at fair and reasonable rates. The 'at least 50 percent' requirement is applicable to the extent such vessels are available at fair and reasonable rates, as determined by the Maritime Administration."  (The Cargo Preference Act of 1954 refers to Section 901(b) of the Merchant Marine Act of 1936, as amended in 46 U.S.C. § 1241(b), and codified in various subsequent documents 46 USC § 55305; 46 C.F.R. Part 381.)

27.      The CHAMP Program includes cargoes that are subject to the Cargo Preference Act pursuant to 46 C.F.R. Part 381.2(b)(1), and (4).  The Cargo Preference Act of 1954 is applied to and administered by all Federal departments and agencies (except the Department of Defense). *See* 46 C.F.R. Part 381.3; *see also* https://www.maritime.dot.gov/cargo-preference/military-cargoes/cargo-preference-laws-and-regulations.  Each Department or Agency is responsible for

ensuring compliance, including contractors. *See id.* An effective measure to promote compliance is to include the appropriate cargo preference clauses in all program contracts and documentation. *Id.* Documentation on all government-impelled cargo moves must be reported to the Maritime Administration within 20 working days from date of loading on all shipments loaded inside the United States and 30 working days for shipments loaded outside the United States. *Id.* This reporting requirement applies to cargo moving on a foreign flag OR U.S. flag vessels. *Id.* Further, the Department of Transportation, Maritime Administration ("MARAD") division provides that this is done *"as a way to track and weed out potential violations."* *See* https://maritime.dot.gov/cargo-preference/military-cargoes/cargo-preference-laws-and-regulations (emphasis added)

28.     The Code of Federal Regulations clearly states that the preference for privately owned U.S. Flag vessels applies to contractors and subcontractors working with the U.S. government. *See* 48 C.F.R. Part 47.503(a)(1).

**B.     The Federal Centralized Household Goods Traffic Management Program ("CHAMP")**

29.     The Department of State has 307 U.S embassies, consulates, and diplomatic missions around the world that require a shipping service for relocation of civilian executive branch employees' Household Goods ("HHG"). The shipping services often include moving services, home sale services, property management, and office relocation assistance. To assist federal agencies in relocating employees and transporting their personal and household goods between duty stations, GSA is in charge of administering the CHAMP program. The program operates through using TSPs, which are qualified and credentialed American private shipping companies vetted by GSA. The TSPs must apply to GSA for approval to participate in the program.

30.     CHAMP is subdivided into two separate programs – Domestic and International. The Domestic program handles both interstate and intrastate shipments between locations in the

continental United States and Alaska.  The International program covers shipments between the continental United States and locations elsewhere in the world, including Hawaii, Guam, Puerto Rico, the Virgin Islands, and foreign countries.

31.    Each program, Domestic and International, requires a separate application. GSA evaluates TSPs based on their financial stability, business experience, quality assurance, and knowledge of the Household Goods Tender of Service ("HTOS"), which is set forth by GSA and provides the rules and requirements for performing services as a provider in CHAMP.

32.    Each participating TSP must submit either a domestic or international application worksheet form.   *See*   https://www.gsa.gov/travel/agency-services/employee-relocation/household-goods-transportation/for-transportation-service-providers/approval-requirements.  Included in this form is the HTOS Questionnaire, which asks about provisions in the HTOS.  In order to attain GSA International Approval, a TSP must file and attest to the answers contained in the HTOS Tender of Service Questionnaire.  If shipping internationally, a TSP will have to answer the International HTOS Questionnaire.

### 1.    Request for Offers ("RFOs") and the bidding process.

33.    Every year, GSA issues a Request for Offers ("RFOs") to all TSPs approved to participate in CHAMP.  The RFOs solicit rate proposals from TSPs for both domestic and international shipping lanes.  During subsequent bidding periods, TSPs may submit offers to provide household goods transportation services to federal civilian agencies.  The rate offers are restricted to the GSA-approved scope of operation (e.g., only TSPs approved to participate in the international program can propose rates for international shipping lanes).

34.    Certain federal civilian agencies, including DOS, have additional reporting and shipping requirements for the transportation of employees' household goods. These agencies regularly work with GSA to promulgate Standing Route Orders ("SROs"), which outline the additional requirements.  The SROs are then issued in conjunction with the annual RFO solicitation

process. TSPs submitting offers for shipping lanes subject to SROs must abide by the requirements stated in both the RFO and SROs.

35.    Once a TSP has been federally approved for either international or domestic shipments by GSA to participate in CHAMP, the participating TSPs selected take full responsibility and agree to all federal rules and requirements outlined in the HTOS guidelines.

36.    Once the applicable bidding period closes, GSA evaluates the various rate offers, or bids, for each shipping lane and awards contracts to TSPs with the most competitive offers. TSP rate offers are evaluated and selected according to GSA's Value Index ("VI") system, which assesses offers based on the TSP's prior service performance, as well the attractiveness of its proposed rates. To calculate prior service performance, GSA employs a Customer Satisfaction Index ("CSI"), which, using data from the previous twelve-month period, measures employee and agency satisfaction with a given TSP's service in comparison to the average level of performance. If data is unavailable for a given TSP, that TSP will be considered unindexed and its prior service performance will not be a factor in the evaluation of its submitted rate offers.

37.    The TSP with the lowest applicable GSA tariff or tender is awarded a single factor rate (SFR), the rate used in computing the accepted transportation for the award. The TSP's rate offer for the surface HHG is represented by a percentage as a single factor rate based on Base-Line Rates.

## 2.    Certified waivers for using foreign flag vessels

38.    Among other RFO requirements, TSPs shipping goods internationally must use U.S. flag vessels for the ocean portion of overseas shipments. If a U.S. flag vessel is not available to provide the required service, TSPs can request permission to use foreign flag vessels prior to shipment. To request permission, a TSP must submit to DOS a "Request for Approval of Use of a Foreign Flag Vessel." It also must certify in writing that US flag shipping is not available or that the use of the foreign flag shipping is necessary to meet delivery requirements.

39.     The use of U.S. flag vessels is more expensive than the use of foreign flag vessels. As a result, TSPs applying for waiver of the U.S. flag vessel requirement must also submit supporting documentation of any changes in the original proposed rate due to the use of foreign flag shipping.

40.     In the result of an increase or decrease of original rates awarded, a TSP is required to submit documentation of differences in rates between the foreign vessel rate and the rate originally awarded.

41.     A TSP is responsible for requesting a waiver by submitting to DOS a certification attesting to the unavailability of a U.S. flag vessel.  The following are examples of the waivers:





### 3.   U.S. General Services Administration's Household Goods Tender of Services ("HTOS")

42.   Pursuant to the statutes above, GSA oversees and sets forth the governing guidelines and regulations TSPs are subject to as CHAMP participants.  GSA sets forth these guidelines pursuant to the U.S. General Services Administration's Household Goods Tender of Service ("HTOS").

43.   The HTOS provides that all participants in the program agree to be bound by the HTOS terms and conditions.  (*See* HTOS, Aug. 2010 Ed.)

The HTOS further provides,

> [t]he TSP shall use vessels of United States registry for the ocean portion of overseas shipments and book shipments for container or below deck stowage. However, when it is determined that the use of a vessel of United States registry will not provide the required service, the TSP shall request permission to use a Foreign Flag vessel prior to start of shipment.

> Requests for permission to use a Foreign Flag vessel shall be made to RTO on the form 'Request for Approval of Use of a Foreign Flag Vessel' (see Appendix C). Approval will be granted only when the TSP *certifies in writing that US flag shipping is not available or the use of foreign flag shipping is necessary* to meet delivery requirements.

HTOS, Aug. 2010 Ed.

44.    The HTOS provides detailed rate information relating to foreign flag vessels:

> Adjustments in rates will be permitted when rate differentials are involved due to the use of Foreign Flag Shipping. A Justification Certificate (see Appendix C) is required for the use of a Foreign Flag vessel. When increases or decreases occur in rates due to the use of Foreign Flag Shipping, billing and documentation submitted in connection with the GBL shipment will have differences between the Foreign Flag vessel rate and the rate used in computing the accepted transportation single factor rate (SFR). The ocean freight bill which must be submitted to support each GBL and the rate will be adjusted in favor of the TSP or the Government on the basis of this bill.

> An example of the adjustment required in the event of an ocean rate increase would be:

> International GBL Shipment Adjustment Example

> SHIPMENT: 3,000 lb, 450 cu ft., Single Factor Rate = $32.00 per cwt

> STEP 1. Original Charges Due: 3,000 lb x $32.00 per cwt = $960.00

> STEP 2. Ocean rate used in constructing the effective GBL rate: 81 cents per cu ft

> STEP 3. Paid to Foreign Flag Ocean TSP as stated on the ocean freight bill and computed in accordance with the measurement rule stated in tariff governing the rate: 90 cents per cu ft (9 cents per cu ft difference)

> STEP 4. Supplemental charge for ocean freight 450 cu ft at 9 cents per cubic foot = $40.50.

> STEP 5. Total charges due TSP: $960.00 + $40.50 = $1,000.50

*Id.* at § 8.3.

45.     The International HTOS Questionnaire that all aspiring TSPs must complete which reemphasizes the importance of these requirements, asks the following questions:

> 33.     When determined that the use of a vessel of the United States registry will not provide the required service, the participant will request permission to use foreign flag vessel prior to start of movement.  (TRUE)
>
> 100.     Adjustments in rates will not be permitted when rate differentials are involved due to the use of Foreign Flag Shipping.  (FALSE)

*See* International HTOS Questionnaire, HHG International Application at https://www.gsa.gov/travel/agency-services/employee-relocation/household-goods-transportation/for-transportation-service-providers/approval-requirements .)

### 4.     Penalties

46.     Also demonstrating the importance and materiality of these requirements, in addition to the Federal False Claims Act, there are significant penalties for submitting false statements in conjunction with TSP services.  "An applicant shall submit an application in its own name for approval as a TSP.  A firm that on its own behalf or on behalf of an agent (a) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (b) makes any false, fictitious or fraudulent statement or representation; or (c) makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry on any part of the application or on any document furnished pursuant to this HTOS is punishable by fines, imprisonment, or both."  18 U.S.C. § 1001; *see also* HTOS, Aug. 2010 Ed. § 2.7.

## V.     OVERVIEW OF THE SCHEME

47.     It is estimated that DOS arranges over 18,000 international shipments of employee belongings each year.  Defendant shipping companies have systematically violated the America-First requirements by carrying out a two-part scheme:  First they submit artificially low bids in order to knock out the competition and secure the shipping routes, or lanes.

48.     Second, having been aware all along that the bids they use to secure the lanes are too low to cover U.S. flag vessel fees, once they are asked to complete a shipment, they falsely certify that no U.S. flag vessel can complete the shipment in order to use the much cheaper foreign flag vessels.

49.     Defendants capitalized on the fact that DOS historically did not have the resources to audit CHAMP bid submissions.  In doing so, companies, such as Defendants, are estimated to have siphoned from taxpayers approximately $360 million, which they unlawfully gave to foreign shipping vessels over the past 10 years—taxpayer money that should have gone to U.S. flag vessel carriers.  This is broken down in the following manner:  18,000 DOS shipments per year; $5,000-$15,000 per move, usually across the ocean, resulting in conservatively <u>40%</u> of shipments fraudulently going to foreign cargo carriers, <u>totaling $36 million per year</u> in false claims submitted.

A.     **Part One of the Scheme:  The submission of the low-ball bids.**

50.     As explained above, twice a year, TSPs can submit bids through the RFO process for an award of different shipping lanes (e.g., D.C to China, Miami to the United Kingdom, etc.). DOS has 225 embassies and consulates worldwide, therefore, there are thousands of lanes at issue. One or more TSPs are awarded each lane.  Once a lane award is secured through GSA, DOS managers arranging an employee move are required to use one of the TSPs that have been awarded the lane.

51.     The process is highly competitive and companies such as Defendants submit low-ball bids to capture the lane awards.  In fact, the rates submitted by Defendants are so low they could only be cost-effective if they intend to unlawfully use cheaper foreign flag cargo vessels. Defendants have no intention of using the more expensive American carriers, knowing DOS will not audit the submissions.  Defendants, through the rigged bids, are awarded the most lucrative lanes and lock out law-abiding competition.

52.     The below examples of submissions to obtain lane awards highlight low-ball bidding practices for what is known as the surface, or "ocean-going" portion of the shipment lanes

from Washington D.C. to London.  The fair market rate of transport for that portion of the lane should have been approximately $7,200 at that time.  These fair market amounts are based on standard costs that all Defendants would be subject to.  There is very little variability between TSPs as far as the costs that they must incur for such shipments.  This is because most of the work of the shipment is done by other companies—i.e., sub-contractors.  Most notably, none of the TSPs have their own ocean shipping vessels, and therefore all must use the relatively small set of ocean shipping companies.

53.     Despite this standard cost range of $7,200 for the Washington D.C. to London surface or ocean-going portion of the lane, the companies below submitted bids approximately **25% below** those market rates.

| Company Name | Telephone | Tender | C.S.I | V.I. | Surface | |
|---|---|---|---|---|---|---|
| | | | | | % | Charge |
| ABLE MOVING & STORAGE, INC. | 703-330-3772 | 118 | 111.22 | 113.4645 | 144% | $5,696.71 |

According to the GSA's TMSS HHG query results run in March 2019, Able Moving and Storage, Inc. would be entering into the transaction losing $1,503.29.

| Company Name | Telephone | Tender | C.S.I | V.I. | Surface | |
|---|---|---|---|---|---|---|
| | | | | | % | Charge |
| COLEMAN AMERICAN MOVING SERVICES | 334-983-6500 | CM19 | 95.59 | 105.1313 | 135% | $5,340.66 |

According to the GSA's TMSS HHG query results run in March 2019, Coleman American Moving Services would be entering into the transaction losing $1,859.34.

| Company Name | Telephone | Tender | C.S.I | V.I. | Surface | |
|---|---|---|---|---|---|---|
| | | | | | % | Charge |
| JK MOVING & STORAGE | 800-673-8487 | SF17 | 96.16 | 105.0785 | 136 % | $5,380.22 |

According to the GSA's TMSS HHG Query Results run in March 2019, JK Moving & Storage would be entering into the transaction losing $1,819.78.

| Company Name | Telephone | Tender | C.S.I | V.I. | Surface | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | % | Charge |
| DEWITT COMPANIES LIMITED, LLC | 888-777-4826 | DWCD | 0.00 | 36.9062 | 139% | $5,498.90 |

According to the GSA's TMSS HHG query results run in March 2019, DeWitt Companies Limited, LLC would be entering into the transaction losing $1,701.10.

| Company Name | Telephone | Tender | C.S.I | V.I. | Surface | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | % | Charge |
| WESTERN EXPRESS | 202-888-6500 | WE17 | 0.00 | 37.1712 | 139% | $5,498.90 |

According to the GSA's TMSS HHG query results run in March 2019, Western Express would be entering into the transaction losing $1,701.10.

54.     Numerous other examples highlight evidence of this fraudulent scheme in the context of the entire cost of the shipping lane, which includes in addition to the surface or ocean-going cost listed in the above examples, the costs associated with the 500 lbs. air shipment and the auto shipment.  In 2019, Defendant Paramount submitted a rate of $13,820 for the Washington D.C. to China lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $13,985—slightly **more** than Paramount's rate.  Paramount would only be able to make a profit on a rate of $13,820 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,771.

55.     In 2016, Defendant Paramount submitted a rate of $10,672 for the Washington D.C. to United Kingdom lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—significantly **more** than Paramount's rate.  Paramount would only be able to make a profit on a rate of $10,672 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965.

56.     In 2019, Defendant Paramount submitted a rate of $12,054 for the Washington D.C. to Germany lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—significantly **more** than Paramount's rate.  Paramount would only be able to make a profit on a rate of $12,054 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $11,436.

57.     In 2019, Defendant Paramount submitted a rate of $13,359, for the Washington D.C. to Netherlands lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,315—significantly **more** than Paramount's rate.  Paramount would only be able to make a profit on a rate of $13,359 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $12,181.

58.     In the same year, Defendant New World submitted a rate of $10,672 for the Washington D.C. to United Kingdom lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—significantly **more** than New World's rate.  New World would only be able to make a profit on a rate of $10,672 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965.

59.     Defendant Paxton participated in the same fraudulent scheme in 2019 when it submitted a rate of $14,204 for the Washington D.C. to the United Kingdom lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—**more** than Paxton's rate.  Paxton would only be able to make a profit on a rate of $14,204 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965.

60.     Similarly, in 2019, Defendant JK Moving submitted a rate of $14,741 for the same Washington D.C. to the United Kingdom lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would similarly be **more** than JK Moving's rate, and evidences that JK Moving never intended to use a U.S. Flag carrier.

61.     Further in 2019, Defendant JK Moving submitted a rate of $15,509 for the Washington D.C. to Germany lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment

on this lane would be $15,759—slightly **more** than JK Moving's rate. JK Moving would only be able to make a profit on a rate of $15,509 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $11,436.

62.      In 2019, Defendant Hilldrup submitted a rate of $11,977 for the Washington D.C. to the United Kingdom lane. Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,703—significantly **more** than Hilldrup's rate. Hilldrup would only be able to make a profit on a rate of $11,977 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965.

63.      Defendant Hilldrup further evidenced fraud that same year when it submitted a rate of $13,743 for the Washington D.C. to Germany lane. Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,759—significantly **more** than Hilldrup's rate. Hilldrup would only be able to make a profit on a rate of $13,743 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $11,436.

64.      This is shown yet again, where Defendant Hilldrup submitted a rate of $14,434 for the Washington D.C. to Netherlands lane. Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,315—slightly **more** than Hilldrup's rate. Hilldrup would only be able to make a profit on a rate of $14,434 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $12,181.

65.      Similarly, in 2019, Defendant Cartwright submitted a rate of $11,209 for the Washington D.C. to the United Kingdom lane. Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—significantly **more** than Cartwright's rate. Cartwright would only be able to make a profit on a rate of $11,209 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965.

66.      Defendant Cartwright submitted a rate of $12,284 for the Washington D.C. to the United Kingdom lane. Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,315—significantly **more** than Cartwright's rate. Cartwright would only be able to

20

make a profit on a rate of $12,284 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $12,181.

67.     The evidence shows that Defendant Western Express also submitted fraudulent low-ball bills in 2019 with a rate of $13,897 for the Washington D.C. to China lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $13,985—$12 **more** than Western Express' rate.  Western Express would only be able to make a profit on a rate of $13,897 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,771.

68.     Similarly, in 2019, Defendant Western Express submitted a rate of $10,642 for the Washington D.C. to the United Kingdom lane.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—significantly **more** than Western Express' rate.  Western Express would only be able to make a profit on a rate of $10,642 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965.

69.     Further, Western Express submitted a rate of $12,822 for the Washington D.C. to Netherlands lane in 2019 as well.  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,315—significantly **more** than Western Express' rate.  Western Express would only be able to make a profit on a rate of $12,822 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $12,181.

**B.     Part Two of the Scheme:  Submission of fraudulent flag waivers.**

70.     In order to profit on the low-ball bids, Defendants needed to falsely certify the need to use foreign carriers, which are must cheaper, by submitting the required waiver form to DOS.  Pursuant to the laws cited above, and the GSA contract, each TSP certifies that the waiver request is accurate and truthful as submitted.

71.     The guidelines and GSA contract make clear that foreign flag vessels are meant to be the rare exception to the rule requiring U.S. flag vessels.  "Approval will be granted only when

the TSP certifies in writing that a U.S. flag carrier is unavailable or the use of foreign flag shipping is necessary to meet delivery requirements."

72.     Defendants relied on DOS's inability to audit these waivers so they could continue to use cheaper foreign vessels and secure lanes with low-ball bids. They knowingly submitted thousands of fraudulent waivers claiming U.S. flag vessels were not available, when in fact they were.  As a result, law-abiding TSPs have been locked out of shipping lanes and have been unable to compete with these companies' unscrupulous practices.

**C.     Further evidence shows that Defendants abandoned the scheme for fear of DOS uncovering the fraud.**

73.     In 2018, Relator and others began raising concerns about the fraudulent practices. As a result, DOS began reemphasizing the U.S. flag requirements during industry conferences and through DOS publications.  On March 27, 2019, DOS held a mandatory TSP meeting.  Emanuel (Manny) Hazel was introduced as the Manager of Foreign Flag Waivers, a newly created position amidst the crackdown to show DOS's recognition of the flagrant abuse of the CHAMP program through submission of fraudulent bids and waivers.

74.     In response, some Defendants have recently stopped carrying out the scheme in fear of a crackdown.  This shift is evidenced by the dramatic increase in their rates which now incorporate the cost of using American ships.  The following chart shows this shift—where some Defendant companies barely broke-even or made a minor profit after switching to U.S. flag vessels.  Other companies' rates skyrocketed for fear of DOS uncovering the fraud:

| FROM D.C. TO | CHINA | | | UK | | | GERMANY | | | NETHERLANDS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PARAMOUNT | RATES FILED | US FLAG*** | NON US FLAG*** | RATES FILED | US FLAG*** | NON US FLAG*** | RATES FILED | US FLAG*** | NON US FLAG*** | RATES FILED | US FLAG*** | NON US FLAG*** |
| 2016 | 15,432 | | | 12,208 | | | 12,054 | | | 12,899 | | |
| 2019 | 13,820 | 13,985 | 9,771 | 10,672 | 15,730 | 9,965 | 12,054 | 15,759 | 11,436 | 13,359 | 15,315 | 12,181 |
| NEW WORLD | | | | | | | | | | | | |
| 2016 | NRF | | | 9,981 | | | 11,517 | | | 12,131 | | |
| 2019 | 14,818 | 13,985 | 9,771 | 10,672 | 15,730 | 9,965 | 11,286 | 15,759 | 11,436 | 12,131 | 15,315 | 12,181 |
| PAXTON | | | | | | | | | | | | |
| 2016 | 13,974 | | | 14,818 | | | 12,284 | | | 19,655 | | |
| 2019 | 15,279 | 13,985 | 9,771 | 14,204 | 15,730 | 9,965 | 16,123 | 15,759 | 11,436 | 20,270 | 15,315 | 12,181 |
| JK MOVING | | | | | | | | | | | | |
| 2016 | 13,436 | | | 13,052 | | | 11,747 | | | 12,745 | | |
| 2019 | 24,185 | 13,985 | 9,771 | 14,741 | 15,730 | 9,965 | 15,509 | 15,759 | 11,436 | 16,431 | 15,315 | 12,181 |
| HILLDRUP | | | | | | | | | | | | |
| 2016 | 13,974 | | | 11,747 | | | 12,975 | | | 13,513 | | |
| 2019 | 18,811 | 13,985 | 9,771 | 11,977 | 15,730 | 9,965 | 13,743 | 15,759 | 11,436 | 14,434 | 15,315 | 12,181 |
| CARTWRIGHT | | | | | | | | | | | | |
| 2016 | 18,427 | | | 11,209 | | | 11,824 | | | 12,208 | | |
| 2019 | 18,657 | 13,985 | 9,771 | 11,209 | 15,730 | 9,965 | 11,209 | 15,759 | 11,436 | 12,284 | 15,315 | 12,181 |
| WESTERN EXPRESS | | | | | | | | | | | | |
| 2016 | 13,897 | | | 10,749 | | | 11,901 | | | 13,436 | | |
| 2019 | 13,897 | 13,985 | 9,771 | 10,642 | 15,730 | 9,965 | 10,979 | 15,759 | 11,436 | 12,822 | 15,315 | 12,181 |

75.     The change in submissions is especially notable in the following shifts highlighted in the above chart:  In 2016, Defendant JK Moving submitted a rate of $13,436 for the Washington D.C. to China lane.  The rates then increased exponentially in 2019 to a rate of $24,185.

76.     In 2016, Defendant Hilldrup submitted a rate of $13,974 for the Washington D.C. to China lane.  The rates increased exponentially, as shown above, when in 2019 it submitted the rate of $18,811 for the same lane.

77.     In 2016, Defendant Paxton submitted a rate of $13,974 for the Washington D.C. to China lane, yet in 2019 submitted a rate of $15,279.

78.     In fact, Defendant JK Moving, one of the biggest offenders in the fraudulent scheme, lost the vast majority of its awards after the 2019 rumors of a crackdown.  While participating in the low-ball scheme, JK Moving was routinely awarded over 150 lanes at a time.  However, the latest round of bidding in December of 2019 reflects JK Moving abandoning the scheme and increasing its rates, in stark contrast to its prior bids.  This shift resulted in JK Moving receiving only 3 lane awards.

79.     Communication between top executives further evidences the fraud.  In a late 2019 meeting between Dawn Fontano of Crown Moving and Daniel Johnson, Director of Customer Service at Defendant Worldwide Moving & Storage, New World International, Ltd., Johnson admitted that New World had "lost a huge amount of money" since paring back its use of foreign flag vessels.  Johnson admitted that abandoning the scheme impacted 40% of its international business.

80.     In early 2020, after the crackdown and having lost projected earnings, Edwin Oems, President of New World International, Ltd. resigned when New World was forced to comply with rates using U.S. flag vessels.  New World lost money on many of its lanes—over $500,000 on revenues of $6 million—because it had submitted low-ball bids in February of 2019 anticipating the ongoing use of false foreign flag waivers, before the March 27 meeting where DOS signaled the fraud would no longer be tolerated.

///

///

///

## VI.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**PRESENTING FALSE CLAIMS,**
**AGAINST ALL DEFENDANTS**
**(31 U.S.C. § 3729(a)(1)(A))**

81.    Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

82.    Defendants knowingly caused to be presented false claims for payment or approval to an officer or employee of the United States.

83.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented false records and statements, including but not limited to contractual bids for shipping lane awards, waivers, and supporting documents to, and through the CHAMP program, administered and overseen by GSA and DOS for the benefit of civilian employees and affiliates of the United States government working for DOS.

84.    Defendants violated federal laws, regulations and guidelines requiring the use of U.S. flag vessels, and the requirement that TSPs submit accurate bids as well as truthful certification that U.S flag vessels were not available in certain circumstances.  Defendants falsely submitted their need for using foreign flag vessels for their own profit and gain in violation of the Merchant Marine Act of 1936, The Cargo Preference Act of 1954 and the corresponding regulations to these Acts, the U.S. General Services Administration's Household Goods Tender of Services guidelines, applicable to all TSP contracts, and the GSA contracts Defendants agreed to enter into for the benefit of the United States government.

85.    Defendants knowingly submitted false bids and certifications in order to obtain lane awards and increase their profits.

25

86.     Defendants knowingly made, used, and caused to be made and used false certifications that their claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

87.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

**SECOND CAUSE OF ACTION**
**ON BEHALF OF THE UNITED STATES**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**MAKING OR USING FALSE RECORDS OR STATEMENTS**
**MATERIAL TO PAYMENT OR APPROVAL OF FALSE CLAIMS,**
**AGAINST ALL DEFENDANTS**
**(31 U.S.C. § 3729(a)(1)(B))**

88.     Relator incorporates herein by reference and realleges the allegations stated in this Complaint.

89.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.  Defendants knowingly violated laws, regulations and guidelines which require use of U.S. flag vessels, absent certain unique circumstances, as a condition and part of each GSA contract entered into to participate in the CHAMP program.  Defendants knowingly submitted to the United States government, through GSA and DOS, inaccurate low-ball bids and fraudulent certifications relating to the alleged need to use foreign flag vessels in order to obtain lane awards.

90.     Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to contractual bids for shipping lane awards, waivers, and supporting documents to, and through the CHAMP program, administered and overseen by GSA and DOS for the benefit of civilian employees and affiliates of the United States government working for DOS.

91.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America, by and through Relator, prays for relief against Defendants as follows:

Pursuant to the False Claims Act:

TO THE UNITED STATES OF AMERICA AND QUI TAM PLAINTIFF:

1. For civil penalties of up to the maximum statutory amount permitted to be imposed for each and every false and fraudulent claim from 2008-2018 for award and payment of shipping lane contracts through the Centralized Household Goods Traffic Management Program presented, or caused to be presented, submitted and certified to the United States General Services Administration and Department of State;

2. For treble damages resulting to the United States Department of State based on the conduct of Defendants;

3. For pre- and post-judgment interest;

4. For reasonable attorneys' fees, costs, and expenses incurred in bringing this case; and

5. That *Qui Tam* Plaintiff be awarded the maximum percentage of recovery allowed pursuant to the False Claims Act.

///

///

///

## VIII.   DEMAND FOR JURY TRIAL

Relators hereby demand a jury trial on all issues so triable.

Dated: August 20, 2021                Respectfully Submitted,

  /s Ryon M. McCabe
Ryon McCabe (FL 009075)
rmccabe@mccaberabin.com
MCCABE RABIN, P.A.
1601 Forum Pl #201
West Palm Beach, FL 33401
Telephone (561) 659-7878

COTCHETT, PITRE & MCCARTHY, LLP
Justin T. Berger (*admitted pro hac vice*)
Sarvenaz J. Fahimi (*admitted pro hac vice*)
San Francisco Airport Office Center
840 Malcolm Road
Burlingame, CA 94010

LAW OFFICES OF PAUL PELLETIER
Paul E. Pelletier (*admitted pro hac vice*)
3500 Morningside Drive
Fairfax, VA 22031

Attorneys for Relator Sedona Partners LLC