# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

OCT 2 4 2002

NANU ~~~~~~~~~~~~~~~~~~~, CLERK
U S DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ALVA BETTIS, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Civil Action No. 99-2879 (ESH) |
| ODEBRECHT CONTRACTORS OF CALIFORNIA, INC., *et al.,* | ) ) ) |
| Defendants. | ) ) ) |

### MEMORANDUM OPINION

Defendant Odebrecht Contractor of California, Inc. seeks to dismiss plaintiff/relator Alva

Bettis' Third Amended Complaint, a *qui tam* action seeking damages and civil penalties under

the False Claims Act, 31 U.S.C. § 3729 ("FCA").[1] As explained herein, defendant's motion is

granted as to Counts I, II, V, and VII, but it is denied as to Counts III, IV, and VI.[2]

### BACKGROUND

Relator's allegations stem from a government contract involving a multimillion dollar

construction project that spanned a six-year period. According to the complaint, the Corps of

Engineers ("COE") issued bid invitations in 1990 for the construction of the Seven Oaks Dam

and Appurtenance in San Bernadino County, California.[3] (Compl. ¶ 12.) In 1993 and 1994, the

---

[1] In a *qui tam* action under the FCA, a private individual is permitted to bring suit in the government's name and by that means to share in the ultimate recovery. Such an individual is known as a "relator." *See United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 546-46 (D.C. Cir. 2002).

[2] According to Odebrecht Contractors of California, Inc., CBPO of America, Inc. has not yet been served, and as to Odebrecht, S.A., either service has not been effected, or if it has been accomplished, a response is not yet due. Therefore, this motion has been filed solely on behalf of Odebrecht.

[3] The work for the Seven Oaks Dam Project included: construction of a 550-feet high embankment dam; a fifty-foot high cofferdam; excavation of a spillway approximately 550 feet wide and 1,400 feet long; completion of the outlet works and intake tower; installation of gates in



52

COE received seven bids and ultimately awarded the contract to the lowest bidder – defendant CBPO of America, Inc.  The complaint alleges that in performing the project, defendant CBPO committed the resources of its affiliates, which included defendants Odebrecht S.A. of Brazil and Odebrecht Contractors of California, Inc.  (*Id.* ¶ 20.)  Defendant's bid was $167,777,000.00, whereas the next lowest bidder, Tutor-Saliba/Perini/Buckley/O&G, submitted a bid for $196,877,000.00.  The government estimated that the project without profit would cost $203,771,540.00.  (Def.'s Mem. Ex. A at ¶ 3.)

Thereafter, the COE contracted with Black & Veatch Consultants ("B&V") to monitor the construction progress of the Seven Oaks Dam Project.  (Compl. ¶ 5.)  In 1995, relator Alva Bettis, a civil engineer and surveyor, was employed by CCL Construction Consultants, Inc. to fulfill B&V's contract.  (Compl. ¶ 5.)  Beginning in April 1995, relator worked as a schedule analyst on the Seven Oaks Dam Project (Pl.'s Opp. at 4); however, in 1998, relator was discharged by CCL from his employment relating to the Seven Oaks Dam Project.  In 1999, relator brought this suit, claiming that defendants had violated the False Claims Act by submitting an intentionally low bid, intending to seek modifications at a later date (Count I); submitting false claims for payment in months when they had received failing grades on required monthly schedules (Count II); engaging in a pattern of submitting requests for payments based on intentionally wrong measurements (Count III); seeking modifications based on false statements concerning the nature and extent of the conditions in the field and the need for the work (Count IV); submitting false statements while performing several construction projects (Count V); improperly charging the government for the cost of delays that defendants had caused (Count VI); and retaliating against relator by influencing his employer's decision to discharge him in violation of 31 U.S.C. § 3730(h).

---

the outlet tunnel; construction of approximately three miles of permanent access roads and two access bridges; and revegetation and hydroseeding of the work areas.  (Compl. ¶ 13.)

2

## LEGAL STANDARD

Defendant has moved to dismiss these claims based on lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), failure to state a claim on which relief may be granted under Fed. R. Civ. P. 12(b)(6), and failure to allege fraud with particularity under Fed. R. Civ. P. 9(b).

In considering defendant's motion to dismiss under Rule 12(b)(6), the Court accepts as true the factual allegations of the complaint and draws from them all reasonable inferences favorable to plaintiff. *See Nix v. Hoke*, 62 F. Supp. 2d 110, 113-14 (D.D.C. 1999); *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996). The Court may dismiss plaintiff's claims only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "However, the court need not accept inferences drawn by plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). What is at issue is not the truth of the plaintiff's allegations or the quality of its proof, but simply the legal sufficiency of the claims made in the complaint. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Therefore, dismissal under Rule 12(b)(6) is proper when, "taking the material allegations of the complaint as admitted, and construing them in plaintiff's favor, the court finds that the plaintiff has failed to allege all the material elements of his cause of action." *Weyrich v. The New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001) (citations omitted).

Additionally, relator must satisfy the heightened pleading requirement of Fed. R. Civ. P. 9(b), which states "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In False Claims Act cases, Rule 9(b) has been interpreted to require a relator to "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981), *cert. denied*, 405 U.S. 999 (1982); *see also Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir.

3

1996) (same); *Totten*, 286 F.3d at 546 ("[A] complaint [must] state the time, place, and content of defendants' alleged false statements, as required by Rule 9(b).")

## LEGAL ANALYSIS

I.   **COUNT I**

A.   *Jurisdiction: The Public Disclosure Bar*

In Count I, relator alleges that "[a]t the time that Odebrecht of America, Inc. submitted its bid, it knew or should have known that it could not possibly complete the project for its bid price of $167,777,000.00." (Compl. ¶ 25.)  According to relator, this low bid was fraudulent because it was deliberately "undervalued to win the award with the full intent to seek modifications and adjustments to the price after winning the contract." (*Id.* ¶ 26.)

Defendant seeks dismissal of this Count pursuant to Fed. R. Civ. P. 12(b)(1) on the grounds that relator's allegations are "based upon" allegations that had already been publicly disclosed,[4] and therefore, relator cannot affirmatively demonstrate that he was an original source of these allegations, as required by section 3730(e)(4)(A) of the False Claims Act.[5]  In *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994), the Court of Appeals for this Circuit established a two-part test to determine if false claims allegations are legitimate or merely opportunistic:

---

[4]  Because this jurisdictional issue arises from the same statute that creates the cause of action, it is appropriate for this Court to treat defendant's motion to dismiss for lack of subject matter jurisdiction as a motion to dismiss for failure to state a claim upon which relief may be granted under Fed R. Civ. P. 12(b)(6).  *See, e.g., United States ex. rel. Holmes v. Consumer Ins. Group*, 279 F.3d 1245, 1248 (10th Cir. 2002) (citing *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 (10th Cir. 1996)); *Am. Farm Bureau v. EPA*, 121 F. Supp.2d 84, 105 (D.D.C. 2000).

[5] Section 3730(e)(4)(A) bars federal jurisdiction over *qui tam* claims that are:
> based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigations, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

4

> First, the reviewing court must ascertain whether the "allegations or
> transactions" upon which the suit is based were "public[ly] disclos[ed]"
> in a "criminal, civil, or administrative hearing, in a congressional,
> administrative, or Government Accounting Office report, hearing, audit
> or investigation, or from the news media." 31 U.S.C. § 3730(e)(4)(A). If
> – and only if – the answer to the first question is affirmative . . . will the
> court then proceed to the "original source" inquiry, under which it asks
> whether the qui tam relator "has direct and independent knowledge of
> the information on which the allegations are based." 31 U.S.C.
> § 3730(e)(4)(B). Under these circumstances, if the *qui tam* plaintiff
> qualifies as an original source, the action may proceed; if she does not,
> the action is barred.

*Id.* at 651 (citations omitted).

As to the first inquiry, it is clear that the general allegations upon which the relator's suit is

based were "publicly disclosed." In July 1993, the Tutor-Saliba Joint Venture ("Tutor-Saliba")

initiated an administrative bid protest that challenged Odebrecht's low bid for the Seven Oaks

Dam project. *See Tutor-Saliba Corp. v. United States Army Corps of Engineers*, Civ. No.

04-0908, 1995 WL 520765 (D.D.C. Aug. 23, 1995). The protest claimed that defendant CBPO's

bid was unreasonably low in light of the government's estimated cost. The COE ultimately

rejected this argument in an administrative letter ruling dated October 29, 1993. (*See* Def.'s

Mem. Ex. A.)[6/] Upon reviewing the COE's decision upholding the contract award, the Honorable

Ricardo M. Urbina concluded that the COE's ruling was not arbitrary and capricious nor did it

violate applicable law and regulations. *See Tutor-Saliba Corp.*, 1995 WL 520765, at *15.

As an initial matter, there can be no doubt that the underlying administrative proceedings

were public. Under 31 U.S.C. § 3730(e)(4)(A), public disclosure includes "administrative

hearing[s]" and "report[s]." The term "hearing" has been construed broadly to be "roughly

synonymous" with the term "proceeding," *Quinn*, 14 F.3d at 652, and it clearly applies to the

_____

[6/]   Contrary to plaintiff's objections, the Court may consider this ruling without
converting this motion into a motion for summary judgment, for it is a matter of public record
and a decision of a governmental agency. Indeed, the Court of Appeals for this Circuit has often
taken judicial notice of administrative decisions. *See, e.g., Aeronautical Radio, Inc. v. FCC*, 983
F.2d 275, 283 n.26 (D.C. Cir. 1993) (citing *Conecuh-Monroe Community Action Agency v.
Bowen*, 852 F.2d 581, 583 (D.C. Cir. 1988) (judicial notice taken of administrative decision not
in record)).

hearings in the Tutor-Saliba protest, for "information revealed in a hearing is 'public' and the term 'hearing' is read to apply to any type of 'legal proceeding.'" *United States ex rel. Alexander v. Dyncorp, Inc.,* 924 F. Supp. 292, 299 (D.D.C. 1996).

Without any legal support, relator nonetheless attempts to argue that the information was not publicly disclosed because "[t]here is no indication that the letter from Division Counsel was ever published by the agency." (Pl.'s Opp. at 21.)  However, publication or public dissemination of information is not required for information to be publicly disclosed pursuant to § 3730(e)(4)(A).  For instance, in *Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 581 (4th Cir. 2000), the Fourth Circuit held that allegations disclosed by displaced bidders in an administrative bid protest constituted "public disclosures" under 31 U.S.C. § 3130(e)(4)(A).  The Court affirmed the dismissal of a *qui tam* complaint, construing "administrative hearing" to include the filing of an administrative complaint where "the filing was not under seal and the document was available upon request to the [agency.  Therefore,] the allegations contained in [the bidder's] agency protest were publicly disclosed." *Id.* at 582; *see also Quinn*, 14 F.3d at 652-53. Furthermore, Judge Urbina's review of the COE's decision in *Tutor-Saliba* made public all allegations that had been raised in the underlying – and unsealed – administrative proceedings.

The closer question is whether the allegations raised in these administrative proceedings are substantially similar to those advanced in Count I.  The public disclosure bar prevents a *qui tam* relator from bringing allegations that are "substantially similar" to those already in the public domain.  *See United States ex. rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 682-88 (D.C. Cir. 1997) (relator must do more that "merely echo[] publically disclosed, allegedly fraudulent transactions").  Thus, it does not matter whether relator can reveal "specific instances of fraud where the general practice has already been publicly disclosed." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999).  These prior public disclosures need not "irrefutably prove a case of fraud" so long as "the 'publicly disclosed transaction is sufficient to raise the inference of fraud.'" *Id.* (quoting *Findley*, 105 F.3d at 687-88).

Here, relator concedes that "the issue presented in the case at bar was touched upon in the decision of the Division Counsel . . . ." (Pl.'s Opp. at 21.) Count I alleges that Odebrecht improperly submitted a low bid. This allegation was raised by the Tutor-Saliba bid protest, which "requested rejection of the apparent low bid submitted by CBPO of America" (Def.'s Mem. Ex. A at ¶ 4), and alleged that CBPO's bid was "unreasonable," because, *inter alia*, it was "29 million below the government fair cost estimate and 36 million below the next low bid." (*Id.* at 4.) In response, the COE rejected the protest, holding that "[i]t is not legally objectionable for a firm, in the exercise of its business judgment to submit a bid which appears to be below cost. Further, a contracting officer may accept such a bid so long as the bidder is responsible and capable of performing the contract at the price it bid." (*Id.* at 17.)

Despite this superficial similarity, relator argues that the prior public disclosure of the underbidding allegation does not in fact bar the present claim because the complaint makes factual and legal assertions that have never before been made public. (*See* Pl.'s Opp. at 22.) Specifically, relator contends that because he has alleged what Tutor-Saliva did not – that defendant entered its deliberately low bid fraudulently with the intention of seeking subsequent modifications from the COE after winning the contract – his claim is not "based upon" allegations that had already been publically disclosed.

In this Circuit, the test for determining whether publically disclosed allegations are sufficient to bar a *qui tam* action is whether:

> the evidence and information in the possession of the United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute. The question, properly, then, is whether the information conveyed [to the government] could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing. . . .

*Quinn*, 14 F.3d at 654 (quoting *Cannon*, 642 F.2d at 1373). Applying this standard here, the Court concludes that the allegations made by Tutor-Saliba were insufficiently similar to those now made by relator to bar Count I from going forward.

Tutor-Saliba's protest simply accused defendant of submitting an unreasonably low bid. It made no claim – directly or by implication – that the bid was made in order to defraud the COE. Instead, the focus of the protest was on the harm that Odebrecht's underbidding inflicted on Tutor-Saliba. There was no reason to believe from those allegations that Tutor-Saliba had accused Odebrecht of bidding low in order to take advantage of the federal government. Indeed, Tutor-Saliba's objection could just as likely have been that Odebrecht's goal was to inflict a competitive injury on Tutor-Saliba by freezing it out of the market for government contracts.

As such, Tutor-Saliba's bare assertion that a rival contractor's bid was too low is not "sufficient to raise the inference of fraud." *Settlemire*, 198 F.3d at 919. This was the COE's view as well. In rejecting the bid protest, it noted that "whether an awardee can perform the contract at the price offered is a matter of responsibility which our office will not review absent a showing of possible fraud or bad faith or that definitive responsibility criteria have not been met." (Def.'s Mem. Ex. A at ¶ 68) (internal quotation marks omitted.) This statement only reinforces the conclusion that the allegations on the public record at the time that the present action commenced were inadequate to alert the government to the *likelihood* (rather than the mere possibility) of wrongdoing. Indeed, relator's suit is the first time anyone has directly alleged, and claimed to have evidence of, fraud on Odebrecht's part. And in the absence of such an allegation, there would have been no basis for government action against defendant. The public disclosure bar should therefore not stand in the way of these claims now that they have finally been made.

Accordingly, although it is true that "a *qui tam* action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain and the *qui tam* plaintiff comes forward with additional evidence incriminating the defendant," *Quinn*, 14 F.3d at 655, this is not the case here. Indeed, Tutor-Saliba's allegations omitted the most basic element of relator's fraud claim – that defendant knowingly submitted a bid it could not perform and that it intended to recover the shortfall from the government. As noted in *Quinn*, for a party to

8

recognize fraud requires that it become aware of both a misrepresented state of facts and a true set of facts; here, however, the government could not have known both.  While it surely knew the "misrepresented" set of facts (*i.e.* defendant's bid price), it could not – on the basis of the Tutor-Saliba protest alone – have been aware of the "true" facts (*i.e.* that the bid was entered with the intent of seeking subsequent modification and of inducing the government to enter a contract with Odebrecht under false pretenses).  Accordingly, there is no reason to believe that the government could have been set on the "trail of fraud" before relator brought the present suit.  *Id.*

In sum, then, relator is arguably the first party to assert that Odebrech's bid was intended, at the time it was made, to take advantage of the federal government and the first to assert that Odebrecht committed fraud by entering into a federal contract based on that low bid.  Because neither of those allegations was disclosed before this action commenced, and because the allegations that were on the public record were insufficient to trigger a government fraud investigation, Count I is not "based upon the public disclosure of allegations or transactions" and thus is not barred by § 3730(e)(4).

B.   *Failure to State a Claim: Fraud-in-the-Inducement*

While the public disclosure bar does not prevent the Court's exercise of jurisdiction over Count I, the Court nevertheless concludes that this count does not state a claim cognizable under the FCA and therefore must be dismissed under Rule 12(b)(6).  As noted above, the asserted basis for Count I is that defendant submitted a bid that was "intentionally undervalued" with the goal of seeking subsequent modifications and adjustments to the contract price.  Compl. ¶¶ 25-26.  According to relator, this action triggers liability under 31 U.S.C. § 3729(a)(1), which makes it illegal for any person to "knowingly present[], or cause[] to be presented,. . . a false or fraudulent claims for payment or approval" and § 3729(a)(2), which imposes liability on those who "knowingly make[], use[], or cause[] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  Compl. ¶¶ 27-28.

9

The theory relied on here is that of fraud-in-the-inducement. In certain cases, courts have held that when a contract is initially obtained through fraud or deception, every claim for payment submitted pursuant to that contract is thereby tainted and triggers FCA liability regardless of whether that claim is itself "false or fraudulent."[2] *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999); *Alexander*, 924 F. Supp. at 298 & n.5; *cf. United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) (identifying inducement theory without passing on the validity of the claims). This approach comports with the statute's legislative history, which suggests that all claims submitted under a contract "which was originally obtained by means of false statements or other corrupt or fraudulent conduct . . . constitutes a false claim." S. Rep. No. 99-345, at 9 (July 28, 1986). Thus, in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court held that claims submitted under a contract that had been obtained through collusive bidding (which inflated the contract price) were actionable. In that circumstance, the initial fraud "did not spend itself with the execution of the contract," but rather "entered into every swollen estimate which was the basic cause for payment of every dollar" paid by the government. *Id.* at 543-44.

If construed broadly, this theory could support Count I. The complaint alleges that defendant made a false statement when it submitted its bid by claiming that it could complete the dam project for $167,770,000, which it knew at the time not to be true. This representation caused the COE to enter into the contract under which it was obligated to pay the claims that defendant eventually submitted. Because those claims would violate § 3729(a)(1), the false bid statement would violate §3729(a)(2).

---

[2] The Court agrees with defendant that in this context a bid is not a "claim" within the meaning of the FCA because it is not itself a "request or demand" for money or property, 31 U.S.C. § 3729(c), but instead merely an offer to enter a contract. *See United States v. Farina*, 153 F. Supp. 819, 821-22 (D.N.J. 1957). Thus, the allegedly false bid does not violate § 3729(a)(1). However, because a bid may be a "statement to get a false or fraudulent claim paid or approved" under § 3729(a)(2), the crucial question is whether any of those actual claims were fraudulent. This is where the fraud-in-the-inducement theory comes into play.

However, the Court concludes that the allegations in Count I do not support the wholesale extension of the fraud-in-the-inducement theory urged by relator. The notion of automatic taint mentioned in the Senate Report and developed in the inducement cases is designed to deal with a situation in which a claim for payment is submitted that is legitimate in and of itself but objectionable because it advances a preexisting fraudulent scheme. *See* S. Rep. No. 99-345, at 9 (giving examples of collusive bidding and of Medicare claims submitted by a physician not eligible to participate in Medicare); *Harrison*, 176 F.3d at 790 & n.13 (liability where contractor submitted false information to induce government into entering a subcontract under which it would pay more for services than it would have solely under the existing contract); *United States ex rel. Fallon v. Accudyne Corp.*, 880 F. Supp. 636, 638 (W.D. Wisc. 1995) (liability for contractor which submitted pricing information that falsely represented that it included the cost of environmental compliance). In these examples, all claims for payment are tainted by the original misrepresentation even if they seek money for work actually and satisfactorily done. Had the government known the truth it would either not have signed the contract or would have negotiated a lower price. Either way, the demands for payment perpetrate the original deceit by helping the wrongdoer get more money from the government than he would have been entitled to had he not made the initial false statement.

The present case, however, differs from this model. Here, the initial deception involved deflating, rather than inflating, the original contract price. According to the complaint, defendant entered into a contract that was favorable to the government presumably with the goal of subsequently using its contractor status to make claims in excess of that price. Therefore, the only facts not disclosed to the government were that defendant knew that the contract could not be completed for the bid amount and planned to seek later modifications that would raise the final price beyond the bid price. But, it is crucial to observe that this kind of scheme is not advanced unless the contractor actually seeks such modifications. If it never does so, the concealed fact (*i.e.* the false statement) remains entirely irrelevant to the government. Indeed,

under such circumstances, the government would actually *benefit* from the misrepresentation, because it would end up paying a lower price for the contract than had the contractor submitted a higher (and more realistic) bid at the beginning stage of the process..

Thus, if a contractor submits an initial bid of $1000, which significantly underestimates the contractor's expected costs, it would make no sense to hold that an otherwise valid claim for payment of $1000 should, due to the fact that the original bid was too low, become a false claim proscribed by the statute. Such demands for payment do not further the original deceit, which depends on the contractor *exceeding* the contract price, and therefore should not be treated as automatically fraudulent. Accordingly, it sweeps too broadly to conclude that *every* claim submitted under a contract obtained through a contractor's intentional underbidding is necessarily a false claim. The FCA should not be used to penalize a party for making claims for payment that seek less money than what the government would have been asked to pay if the allegedly fraudulent statement had never been made. Attaching liability in this context would only punish the contractor for having had illicit thoughts at the time of the bidding, rather than for doing what the text of the statute actually forbids: submitting demands for money to which it is not legitimately entitled. *See United States ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844, 850 (E.D. Va. 1998).

To do so would hardly help to protect the public fisc. Indeed, it might even subvert that fundamental statutory goal by imposing liability on contractors who recklessly (or even knowingly) submit low bids, but then – whether through unexpected efficiency or a willingness to do a job at a loss – only seek to collect the amount of the original bid. Such a result could create a disincentive for contractors to offer low bids in the first place, as doing so might subject them to FCA suits brought by disgruntled rivals.

Accordingly, in the absence of an allegation that defendant submitted any claim for payment in excess of its bid price, relator cannot hold defendant liable under the FCA merely for obtaining the contract based on an intentionally undervalued bid. And, indeed, Count I makes no

12

such allegation. Relator has not pleaded that defendant ever submitted any request to modify the contract price above the $167,777,000 that it originally bid or that it submitted requests for payment in excess of that amount. The only actual act referenced in this count is the initial bid and the only misrepresentation involves defendant's allegedly undisclosed "intent" to seek later modifications and adjustments. For the reasons given above, this is not enough to state a claim under the FCA. Accordingly, while the Court has jurisdiction over Count I, that count must be dismissed under Rule 12(b)(6), without prejudice.

## II.   COUNT II

In Count II, relator alleges that "Odebrecht knew or should have known that it was not entitled to receive payment for services in months when it did not receive a passing grade from the COE about the submitted monthly schedule, but Odebrecht submitted invoices for payment in these months nonetheless. . . . Each invoice submitted by Odebrecht certified that it had completed services in accordance with the terms of the contract but the failing grades from the COE, especially in consecutive months, shows that the terms of the contract and the schedule were not being met. . . . When Odebrecht submitted invoices to the COE for payments in months in which its submitted schedule did not receive a passing grade, Odebrecht made false statements." (Compl. ¶¶ 45-47.)

Defendant argues that relator has failed to allege facts to satisfy 31 U.S.C. § 3729(a), for relator "does not suggest that any of the work for which partial payment was sought had not been completed," and relator mistakenly "assumes that a contractor makes a false statement to the government any time that the contractor submits an invoice to the government in a month during which the contractor and government are involved in a good faith scheduling dispute." (Def.'s Mem. at 23.) To state a claim under 31 U.S.C. §§ 3729(a)(1)-(a)(2), relator must allege that defendant knowingly submitted a claim that is "false or fraudulent," a statement or record that is "false," or both. *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 297 (D.C. Cir. 1994).

However, relator fails to cite to any contract language that bars defendant from submitting invoices for payment in months when it has failed to receive passing grades on schedules. Instead, relator merely states that "the failing grades from the COE, especially in consecutive months, show[] that the terms of contract and the schedule were not being met." (Compl. ¶ 46.) This statement, however, does not allege that defendant knowingly either submitted a claim that is "false or fraudulent" or a statement or record that is "false."

As support for its tenuous claim, relator offers Army regulations that grant contracting officers discretion to withhold partial payments until a schedule is approved. "If a schedule is not provided or actual progress fails to meet the schedule the Contracting Officer may withhold progress payments or default the contractor." (Compl. ¶ 38) (quoting Army Regulation ER 1-1-11, Section 4.) Additionally, the regulations instruct that "[p]artial payments can not be processed until an acceptable NAS schedule has been submitted; therefore, Contracting Officer will not make partial payments until an acceptable schedule is received and approved." (Id. ¶ 39) (quoting Army Regulation ER-1-1-11, Section 7.) These regulations, however, do not prevent contractors from submitting invoices for work performed. On the contrary, they assume that contractors will do so, and the regulations provide contracting officers with discretion to withhold partial payments until an acceptable schedule has been received and approved.[8]

In short, relator is unable to point to any regulations or contract provision that precludes defendant from submitting a claim for partial payments in months when Odebrecht's monthly

_____

[8]Additionally, relator cannot claim that defendant made a false certification when it stated:

> I certify that I have checked the quantities covered by this . . . bill or estimate; that the quantities are correct and consistent with all previous computations as actually checked; that the quantities and amounts are wholly consistent with the requirements of the contract or other instruments involved.

(Compl. ¶ 56.) This certification does not address receipt of passing grades on schedules or scheduling requirements in any manner. Thus, it is irrelevant to plaintiff's claim in Count II.

update schedules had not been approved.  There can, therefore, be no claim that defendant

knowingly submitted a false or fraudulent claim, and Count II is dismissed under Rule 12(b)(6).

### III.    COUNT III

In Count III, relator claims that "Odebrecht submitted vouchers for work that it had not

performed, and in so doing, made a False claim." (Compl. ¶ 55.)  According to relator, when

Odebrecht submitted invoices for partial payment, it made the following certification:

> I certify that I have checked the quantities covered by this bill or
> estimate; that the work was actually performed; that the quantities are
> correct and consistent with all previous computations as actually
> checked; that the quantities and amounts are wholly consistent with
> the requirements of the contract or other instruments involved.

(*Id.* ¶ 56.)  Contrary to this certification, Odebrecht allegedly submitted invoices that incorrectly

assessed the vertical height figures of the face of the dam and therefore the square feet of rock

poured, and the "submission of invoices with improper vertical height figures by Odebrecht was

a knowing effort on the part of Odebrecht to obtain payment under false pretenses from the

government." (*Id.* ¶ 63.)

Defendant's motion as to Count III must be denied, for a careful reading of this count

does not support defendant's claim that defendant has failed to allege facts sufficient to find that

defendant "knowingly" submitted false or fraudulent claims, or false or fraudulent statements.

31 U.S.C. § 3729(a)(1)-(a)(2).  Under the False Claims Act, a person acts "knowingly" if he or

she "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or

falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

Defendant attempts to characterize alleged mismeasurements as "honest mistakes," "incorrect

claims submitted through mere negligence," or "[b]ad math." (*See* Def.'s Mem. at 26-27)

(citing, *e.g.*, *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th

Cir. 1995)).  However, taking plaintiff's allegations as true and construing them in a light most

favorable to the relator, as must be done at this stage, the Court concludes that relator has alleged far more than mere negligence. Properly read, Count III alleges sufficient facts to support an inference that defendant knowingly and deliberately submitted false measurements in an attempt to obtain payment under false pretenses from the government. Therefore, the motion to dismiss Count III is denied.[9]

## V.   COUNT IV

With respect to Count IV, as well as all other counts (except Count VII), defendant argues that they should be dismissed because they fail to meet the heightened pleading requirements of Rule 9(b). Defendant relies on plaintiff's failure to identify exactly which of

---

[9]  At this early stage, this Court cannot address the COE's alleged knowledge of incorrect measurements prior to payment. Although defendant argues that such awareness by the government mandates dismissal (Def.'s Rep. at 11), such an argument depends on a consideration of matters that go beyond the face of the complaint. Moreover, even if the COE performed "verification surveys" to conform measurements within one day of Odebrecht's surveys (*see* Pl.'s Opp. at 31), that fact alone may not necessarily erase the taint of fraudulent actions, because the relevant consideration should be whether there was fraud at the time of submission of the measurements.

For instance, the Court in *United States v. Southland Management Corp.*, 288 F.2d 665, 680 (5th Cir. 2002), concluded that the fact the government was aware of allegedly false certifications did not preclude a finding of falsity. "[I]t is] difficult to comprehend how the government's awareness that a claimant's submission was false would in any way affect the truth or falsity of the claim. A lie does not become the truth simply because the person hearing it knows that it is a lie." *Id.* As to the issue of *mens rea*, the Fifth Circuit noted that, "[w]hile we agree that, in certain situations, evidence that the defendant knew that the government was aware of the falsity of a claim when it was submitted may be relevant in determining whether the defendant knowingly submitted a false claim, we hold that such knowledge on the part of the defendant is not an automatic defense to liability. . . . [T]here is nothing in the legislative or statutory history of the Act suggesting that Congress intended to preclude the government from pursuing an action under the civil FCA when the government was aware of the facts and circumstances rendering a claim false at the time of submission." *Id.* at 685; *see also United States v. Krizek*, 111 F.3d 934, 939-40 (D.C. Cir. 1997) (the question of what constitutes a claim "turns[ ] not on how the government chooses to process the claim, but on how many times the defendants made a 'request or demand'" because the "gravamen of these cases is that the focus is on the conduct of the defendant").

However, since Count III's allegations are sufficient to withstand a motion to dismiss, the Court need not now address the legal issues that may be presented regarding the effect of the government's supposed knowledge of the false measurements.

the three named defendants, Odebrecht Contractors of California, CBPO, and Odebrecht, S.A., of Brazil, allegedly submitted false claims. However, this argument is unpersuasive. This is not an instance where relator has "'indiscriminately group[ed] all of the individual defendants into one wrongdoing monolith.'" *United States ex rel. Branhan v. Mercy Health Sys. Of Southwest Ohio*, 188 F.3d 510 (6th Cir. 1999) (unpublished table decision) (Clay, concurring in part and dissenting in part on other grounds) (quoting *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1443 (S.D. Cal. 1988) (involving "large and complicated securities fraud action")). Given that the complaint identifies three defendants as affiliated corporations that engaged in a collective project to build the Seven Oaks Dam and indicates that Odebrecht, S.A., was the principal holding company of the other two defendants, there is no need to draw distinctions among the three entities in order to satisfy the requirements of Rule 9(b).

V.    **COUNT V**

In Count V, relator alleges:

79.    Odebrecht made false and misleading statements concerning the construction of the Intake Access Road. These statements were included in NAS schedules Numbered 23, 31, 40.

80.    The COE advised Odebrecht that its submitted NAS Construction update did not match the on-going work.

81.    Nonetheless, Odebrecht sought and obtained revisions to the bid price for this work from $4.00 per cubic yard to $16.56 per cubic yard raising the price from $136,000.00 to $1,738,524.00.

82.    Odebrecht made other false statements concerning the conditions present and work performed regarding the Spillway Haul Roadway Excavation above the Intake Structure ($180,000.00); the Recovery of Excess Unit Price of Rock Bolts ($1,508,434.00); the Finger Waste Area (Zone 5) ($1,500,000.00); and Remediation –Intake Access Road Slopes ($754,000.00).

Paragraphs 79-82 fail to satisfy Rule 9(b) due to their failure to explain how such statements were false. "[A]rticulating the elements of fraud with particularity requires a relator to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997) (quoting *Mills v. Polar Molecular Corp.*, 12

F.3d 1170, 1175 (2d Cir. 1993)).   Count V does not explain what statements were allegedly false, why they were false, or how they were linked to allegedly false claims for payment. Accordingly, defendant cannot defend itself or respond meaningfully. *See, e.g., United States ex rel. McCoy v. California Medical Review, Inc.*, 723 F. Supp. 1363 (N.D. Cal. 1989). This count will be dismissed without prejudice.

## VI.   COUNT VI

In Count VI, relator alleges:

88.  Odebrecht unfairly and unjustly charged the United States Government for the cost of delays that it caused itself.

89.  Odebrecht dramatically altered the plan and the schedule of the construction over the course of the project, and then sought significant adjustments.

90.  In seeking and obtaining payment of unfair and false vouchers for payments OCC received the following monies in violation of the False Claims Act:

a.  Acceleration costs attributed to the COE when in fact the delay was caused by Odebrecht in a month when the submitted schedule had not been approved. $1,388,751.00.

b.  Delay in the construction of the conveyor that was charged to the government but was really caused by the failure of Odebrecht to have the necessary equipment on-site. $1,190,358.00.

In the Court's view, this count is not defective under Rule 9(b), even though paragraphs 88 and 89 lack specificity. It is fair to assume from reading the count in its entirety that the only two false claims at issue involve the claims made for the payment of the acceleration costs and the conveyor, which are described in paragraph 90. Rule 9(b) does not require that relator allege all facts supporting every instance of a false claim. *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (relator provided a general time frame in which the conduct occurred). Rather, what is required is that the complaint be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993). While Count VI may not be the model of clarity or specificity, especially with respect to time, it nevertheless passes muster under Rule 9(b).

## VII.   COUNT VII

In Count VII, plaintiff alleges that defendants retaliated against him in violation of 31

U.S.C. § 3730(h), which provides:

> Any employee who is discharged . . . by his or her *employer* because
> of lawful acts done by the employee on behalf of the employee or
> others in furtherance of an action under this section . . . shall be
> entitled to all relief necessary to make the employee whole.  Such
> relief *shall include* reinstatement with the same seniority status such
> employee would have had but for the discrimination, 2 times the
> amount of back pay, interest on the back pay, and compensation for
> any special damages sustained as a result of the discrimination,
> including litigation costs and reasonable attorneys' fees.

*Id.* (emphasis added).

Although plaintiff concedes that he was not employed by any of the named defendants,

he contends that "his discharge was influenced by Odebrecht in response to Plaintiff's discovery

of . . . false statements and claims . . . in violation of the False Claim Act, 31 U.S.C. § 3730(h)."

(Compl. ¶ 1; *see also id.* ¶ 96.)  Thus, whether Count VII survives hinges on whether allegations

that the discharge decision was "influenced" by defendant are sufficient.

The parties agree that the starting point for interpreting a statute is the language of the

statute itself.  *See FPC-Boron Employees' Club*, 105 F.3d at 681.  Section 3730(h) of the Act

enables "[a]ny employee who is discharged . . . by his or her employer . . ." the entitlement to

pursue "all relief necessary."  This language of § 3730(h), does not, however, clearly delineate

the class of defendants that such employees may sue.  In support of its expansive reading of this

provision, plaintiff relies on *United States ex rel. Kent v. Aiello*, 836 F. Supp. 720 (E.D. Cal.

1993), which held that a defendant need not have been the plaintiff's immediate past employer in

order to be sued under § 3730(h):

> [P]roperly read, the statute defines the class of plaintiffs who may bring
> suit . . . rather than those against whom suit may be brought.  That is to
> say that while it is true that under the statute a relator must have been an
> employee, the statute says nothing about the class of defendants.  Thus
> the defendants' reliance on section 3730(h) as requiring that defendants
> must have been plaintiff's employer is unfounded.

*Id.* at 724.  The court thus suggested that "if plaintiff sought only monetary relief, it could be

ordered against any defendant contributing to an injury cognizable under the statute . . . ." *Id.* at

725. Under this reading, it could be argued that Count VII should survive a Rule 12(b)(6)

motion in light of plaintiff's allegation that "CBPO and Odebrecht *influenced* the decision to

discharge him" after he engaged in conduct protected by the FCA. (Compl. ¶¶ 96, 100 (emphasis

added))

It is important to emphasize, however, that *Kent* did not rely solely on this broad

interpretation of § 3730(h) in order to reach its holding that plaintiffs' claims could go forward.

Instead, the court determined that even if the statute does limit the class of prospective

defendants to the plaintiff's "employer," that term should be read generously to include previous

employers who interfere with the plaintiff's "subsequent employment opportunities." *Id.* at 726

(*citing Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1021 (9th Cir. 1983)). On the

facts of *Kent*, this interpretation posed no obstacle to plaintiffs' suit: the plaintiffs had actually

been employed by both defendants and had alleged that the two employers were "alter egos" and

that one had "dominated, controlled, influenced, and directed" the other. *Id.* at 724 & n.8. Thus,

*Kent* only held that a genuine "employment relationship" (present or past) between the plaintiff

and the defendant is necessary in order for § 3730(h) to be applicable.

Subsequent cases have adopted this more limited reading of *Kent* and of § 3730(h). In

*Mruz, v. Caring, Inc.*, 991 F. Supp. 701 (D.N.J. 1995), for instance, plaintiffs brought a

retaliation action under § 3730(h) against fifteen defendants, including their former employer,

related corporations, as well as against a number of individuals with whom they had had no

previous employment relationship. In dismissing plaintiffs' claims against those individuals, the

court concluded that *Kent* "simply *never* went so far as to hold that those who never had an

employment relationship with the actual employer could be sued under the statute, let alone hold

that mere conspiracy with an employer could subject someone to liability under section 3730(h)."

*Id.* at 709-10.

In support of its narrower reading of the statute, the court noted that "[e]verything about the plain language of section 3730(h) reflects a legislative intent to operate exclusively in the area of the employment relationship." *Id.* at 709. The statute focuses on specific work-related actions taken by the plaintiff's employer – discharge, demotion, suspension, etc. – and *mandates* particular forms of relief – reinstatement, back pay, interest on back pay – that "can logically be granted only by someone who has or had an employment relationship with a section 3730(h) plaintiff." *Id.* at 709. The statutory text thus appears to contemplate that suits under § 3730(h) would only be brought against a defendant who was in a position to take such actions and to provide such remedies. A § 3730(h) claim thus seems misdirected when brought, as in the present case, against a defendant who is not and has never been in any kind of employment relationship with plaintiff. Indeed, it is quite incongruous to seek (as plaintiff does here, *see* Compl., Prayer ¶ 4) back pay from a defendant who has never paid plaintiff wages of any kind.

The holding in *Nguyen v. City of Cleveland*, 121 F. Supp. 2d 643, 648 (N.D. Ohio 2000), supports this approach to the statute. As in the instant case, *Nguyen* involved a retaliation suit brought after the plaintiff had been allegedly terminated at the behest of a third party for exercising his rights under the FCA. There, however, the suit was brought against both the third-party and the employer that had done the actual termination. While the court did allow the claim against the third party to proceed even though that defendant was not plaintiff's employer at the time he took the protected action, the court does not suggest that it would have reached the same result with respect to a defendant that had *never* been plaintiff's employer. Indeed, *Nguyen* specifically acknowledges the holding of *Mruz* that the § 3730(h) was not designed to cover "defendants who had never had an employment relationship with the plaintiff." *Id.* at 648.

In the present case, of course, plaintiff has made no allegation that he has ever had any sort of employment relationship with defendant. The complaint asserts that the COE first entered into a contract with defendant to complete the Seven Oaks Dam Project. Thereafter, in 1995, the COE entered into an entirely separate contract with B&V to "monitor" the project. Plaintiff, an

employee of CCL, was then employed "to fulfill a contract with [B&V]," (Compl. ¶ 5), and in 1999, CCL Construction is alleged to have terminated relator from employment. In light of this attenuated connection between plaintiff (and his employer) and defendant, plaintiff's reliance on *Kent* and *Nguyen* is unavailing.

In sum, then, the case law construing § 3730(h) simply does not support plaintiff's attempt to use that statute to sue a defendant who is not and has never been his "employer." This conclusion derives from the text and structure of § 3730(h), which focuses on employment-related wrongs and insists upon employment-related remedies. It is also bolstered by the fact that nothing in that provision suggests that it was intended to reach beyond employment disputes between employees and their employers to cover logically distinct claims of conspiracies between a plaintiff's actual employer and a third party with whom the plaintiff has had no employment relationship whatsoever.

Plaintiff's allegations here amount to an accusation that defendant conspired with relator's employer to have him fired. However, § 3730(h) contains no specific language providing a remedy against those who aid and abet or conspire with an employer to discriminate against an employee. This omission is striking given that a closely related section of the same statute offers just such a remedy. Section § 3729(a)(3) imposes liability on "any person who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." The imperfect symmetry between these two sections suggests that Congress knew how to draft an anti-conspiracy provision, and that it could (and presumably would) have done so in § 3730 had it actually intended that form of liability to attach to retaliation claims. Such incongruity provides further reason to read § 3730(h) narrowly to reach only acts of retaliation against plaintiffs by their employers and not acts of unaffiliated third parties that may have abetted or helped trigger such unlawful conduct. *See Mruz*, 991 F. Supp. at 709 (holding, based on similar reasoning, that "liability under section 3730(h) cannot be extended on the basis of a conspiracy").

There is thus ultimately no legal support for the proposition that § 3730(h) should be extended to reach a defendant who allegedly "influences" an employment decision without having any prior or existing employment relationship with the employee bringing the suit. Nor has plaintiff here advanced any compelling reason why such liability should be extended in this sweeping and unprecedented fashion. The Court therefore concludes that plaintiff cannot state a claim for which relief can be granted under § 3730(h), and thus, Count VII must be dismissed.

## CONCLUSION

For the reasons given above, defendant's motion is granted as to Counts I, II, V, and VII, and defendant's motion is denied as to Counts III, IV, and VI. Count II, and VII are dismissed with prejudice; Counts I and V are dismissed without prejudice.

ELLEN SEGAL HUVELLE
United States District Judge

Dated:   October 24, 2002

23