**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 1:20-cv-23242-BB

UNITED STATES OF AMERICA *ex rel*. SEDONA
PARTNERS LLC,

               Plaintiff,

   vs.

ABLE MOVING & STORAGE, INC.; ARPIN
INTERNATIONAL GROUP, INC; CARTWRIGHT
INTERNATIONAL VAN LINES, INC.; COLEMAN
AMERICAN MOVING SERVICES, INC.; DEWITT
COMPANIES LIMITED, LLC; HILLDRUP
COMPANIES, INC.; J.K. MOVING & STORAGE
INC.; NEW WORLD INTERNATIONAL, LTD.;
PARAMOUNT TRANSPORTATION SYSTEMS;
PAXTON VAN LINES, INC.; AND WESTERN
EXPRESS FORWARDING, LLC,

               Defendants.

---

**RELATOR SEDONA PARTNERS LLC'S OPPOSITION TO**
**DEFENDANT CARTWRIGHT INTERNATIONAL VAN LINES, INC.'S**
**MOTION TO DISMISS FIRST AMENDED COMPLAINT**

## I.      INTRODUCTION

      This is a *qui tam* case alleging that Defendant Cartwright International Van Lines, Inc.

("Cartwright") and other private shipping companies known as a "Transportation Service

Providers," ("TSPs") submitted fraudulent bids to obtain shipping contracts through the United

States Department of State ("DOS") under the supervision and guidance of the United States

General Services Administration ("GSA").  Specifically, Relator alleges that from approximately

2008 through 2018, Defendant TSPs carried-out a fraudulent scheme wherein hundreds of millions

of dollars were illegally taken from taxpayers, American workers, and American companies

because foreign flag vessels were routinely and illegally used by the TSPs, instead of U.S. flag

vessels, in violation of longstanding "America-First" policies.  The scheme was carried out through

two false submissions to the government:  First, Defendant TSPs, including Cartwright, submitted

fraudulent low-ball bids in order to capture awards for very competitive shipping routes, referred

to as "lanes," across international waters.  Second, in order to profit on their low-ball bids, Defendants submitted thousands of false foreign flag waivers, requesting permission to use lower costing foreign flag vessels, by fraudulently certifying that no U.S. flag vessels were available to carry-out shipments and/or that a foreign flag vessel was necessary to meet delivery requirements. These waivers were routinely granted to Defendants, resulting in hundreds of millions of dollars going to foreign companies instead of American companies.

Cartwright's motion to dismiss fails.  First, Relator has pled facts sufficient to meet the Rule 9(b) requirement of particularity and has shown reliable indicia that claims were fraudulently submitted and presented.  Second, the public disclosure bar is inapplicable as there was no public disclosure of the allegations or transactions at issue.

Law abiding American businesses, which federal law prioritizes, have been locked out of shipping lane contracts because of this fraudulent scheme.  Accordingly, Relator respectfully requests Cartwright's motion to dismiss be denied, or in the alternative, Relator be given leave to amend.

## II.      STATEMENT OF FACTS

### A.      The Federal Centralized Household Goods Traffic Management Program ("CHAMP") and the "America-First" Policy

Defendant Cartwright provides transportation and logistics services. It is based in Grandview, Missouri.  The Company offers domestic and international residential and military household goods moving, relocation services, global logistics, freight forwarding, and mobility solutions.  Cartwright is the leading provider of United States military moving services.  (First Amended Compl. ("FAC") ¶ 16.)

The DOS has 307 U.S embassies, consulates, and diplomatic missions around the world that require a shipping service for relocation of civilian executive branch employees' Household Goods ("HHG"). (FAC ¶ 29.)  The shipping services often include moving services, home sale services, property management, and office relocation assistance.  Many federal civilian offices pay for and assist their employees and families in relocating and moving their belongings through a

GSA program—the Centralized Household Goods Traffic Management Program ("CHAMP"). (FAC ¶ 2.)  Shipping providers, or TSPs, participate in the CHAMP program and compete for shipping contract awards.  In providing these shipping services, participants are subject to various strict guidelines and requirements that are overseen and set forth in DOS, GSA, and federal laws and regulations.  (FAC ¶ 2.)

One of the key requirements TSPs must follow is the "America-First" policy, which is based on federal maritime and cargo laws.  (FAC ¶ 2.)  This policy requires that the companies use, and work with, "U.S. flag vessels" (American shipping carriers), except in unique circumstances where a waiver is obtained for use of a "foreign flag vessel."  (FAC ¶ 2.)  Foreign flag vessels are much cheaper than American carriers, and do not follow U.S. laws and customs. (FAC ¶ 2.)  For example, U.S. flag carriers are required to have U.S. Citizen crews and pay payroll taxes, and crew members pay U.S. income taxes.  (FAC ¶ 2.)   U.S. flag carriers are subject to Coast Guard regulations and environmental regulations, and U.S. flag carrier ships must be built (with some exceptions) and repaired in U.S. shipyards. (FAC ¶ 2.)  This "America-First" policy has been in place for decades and is codified in multiple federal statutes, regulations, and guidelines.  (FAC ¶ 3.)

With 225 embassies and consulates around the world, DOS uses this program thousands of times per year to relocate DOS employees by shipping their belongings both domestically and internationally.   (FAC ¶ 4.)  GSA is in charge of administering the CHAMP program.  (FAC ¶ 29.)  The program operates through using TSPs, which are qualified and credentialed American private shipping companies vetted by GSA.  (FAC ¶ 29.)  The TSPs must apply to GSA for approval to participate in the program.  (FAC ¶ 29.)

CHAMP is subdivided into two separate programs – Domestic and International.  (FAC ¶ 30.)  The Domestic program handles both interstate and intrastate shipments between locations in the continental United States and Alaska.  (FAC ¶ 30.)   The International program covers shipments between the continental United States and locations elsewhere in the world, including

Hawaii, Guam, Puerto Rico, the Virgin Islands, and foreign countries.  (FAC ¶ 30.)  Each program, Domestic and International, requires a separate application.  (FAC ¶ 31.)

GSA evaluates TSPs based on their financial stability, business experience, quality assurance, and knowledge of the Household Goods Tender of Service ("HTOS"), which is set forth by GSA and provides the rules and requirements for performing services as a provider in CHAMP. (FAC ¶ 31.)

Each participating TSP must submit either a domestic or international application worksheet form.  See  https://www.gsa.gov/travel/agency-services/employee-relocation/household-goods-transportation/for-transportation-service-providers/approval-requirements at FAC ¶ 32.  Included in this form is the HTOS Questionnaire, which asks about provisions in the HTOS.  (FAC ¶ 32.)  In order to attain GSA International Approval, a TSP must file and attest to the answers contained in the HTOS Tender of Service Questionnaire.  If shipping internationally, a TSP will have to answer the International HTOS Questionnaire.  (FAC ¶ 32.)

### 1.      Request for Offers ("RFOs") and the bidding process.

Every year, GSA issues a Request for Offers ("RFOs") to all TSPs approved to participate in CHAMP.  (FAC ¶ 33.)   The RFOs solicit rate proposals from TSPs for both domestic and international shipping lanes. (FAC ¶ 33.)   During subsequent bidding periods, TSPs may submit offers to provide household goods transportation services to federal civilian agencies.  (FAC ¶ 33.) The rate offers are restricted to the GSA-approved scope of operation (e.g., only TSPs approved to participate in the international program can propose rates for international shipping lanes). (FAC ¶ 33.)   Certain federal civilian agencies, including DOS, have additional reporting and shipping requirements for the transportation of employees' household goods. (FAC ¶ 34.)   These agencies regularly work with GSA to promulgate Standing Route Orders ("SROs"), which outline the additional requirements.   The SROs are then issued in conjunction with the annual RFO solicitation process.  (FAC ¶ 34.)  TSPs submitting offers for shipping lanes subject to SROs must abide by the requirements stated in both the RFO and SROs.  (FAC ¶ 34.)

Once a TSP has been federally approved for either international or domestic shipments by GSA to participate in CHAMP, the participating TSPs selected take full responsibility and agree to all federal rules and requirements outlined in the HTOS guidelines.  (FAC ¶ 35.)   Once the applicable bidding period closes, GSA evaluates the various rate offers, or bids, for each shipping lane and awards contracts to TSPs with the most competitive offers.  (FAC ¶ 36.)   TSP rate offers are evaluated and selected according to GSA's Value Index ("VI") system, which assesses offers based on the TSP's prior service performance, as well the attractiveness of its proposed rates. (FAC ¶ 36.)   To calculate prior service performance, GSA employs a Customer Satisfaction Index ("CSI"), which, using data from the previous twelve-month period, measures employee and agency satisfaction with a given TSP's service in comparison to the average level of performance.  (FAC ¶ 36.)   If data is unavailable for a given TSP, that TSP will be considered unindexed and its prior service performance will not be a factor in the evaluation of its submitted rate offers. (FAC ¶ 36.) The TSP with the lowest applicable GSA tariff or tender is awarded a single factor rate (SFR), the rate used in computing the accepted transportation for the award. (FAC ¶ 37.)   The TSP's rate offer for the surface HHG is represented by a percentage as a single factor rate based on Base-Line Rates.  (FAC ¶ 37.)

### 2.    Certified waivers for using foreign flag vessels

Among other RFO requirements, TSPs shipping goods internationally must use U.S. flag vessels for the ocean portion of overseas shipments.  (FAC ¶ 38.)   If a U.S. flag vessel is not available to provide the required service, TSPs can request permission to use foreign flag vessels prior to shipment. (FAC ¶ 38.)   To request permission, a TSP must submit to DOS a "Request for Approval of Use of a Foreign Flag Vessel."  (FAC ¶ 38.)   It also must certify in writing that US flag shipping is not available or that the use of the foreign flag shipping is necessary to meet delivery requirements.  (FAC ¶¶ 38; *see also* ¶ 41 for examples of the waiver forms.)

The use of U.S. flag vessels is more expensive than the use of foreign flag vessels.  (FAC ¶ 39.)   As a result, TSPs applying for waiver of the U.S. flag vessel requirement must also submit supporting documentation of any changes in the original proposed rate due to the use of foreign

flag shipping.  (FAC ¶ 39.)   In the result of an increase or decrease of original rates awarded, a TSP is required to submit documentation of differences in rates between the foreign vessel rate and the rate originally awarded.  (FAC ¶ 40.)

### 3.     U.S. General Services Administration's Household Goods Tender of Services ("HTOS")

Pursuant to statute and regulations, GSA oversees and sets forth the governing guidelines and regulations TSPs are subject to as CHAMP participants.  (FAC ¶ 42.)   GSA sets forth these guidelines pursuant to the U.S. General Services Administration's Household Goods Tender of Service ("HTOS").  (FAC ¶ 42.)   The HTOS provides that all participants in the program agree to be bound by the HTOS terms and conditions.  (*See* FAC ¶ 43, HTOS, Aug. 2010 Ed.)

The HTOS further provides,

[t]he TSP shall use vessels of United States registry for the ocean portion of overseas shipments and book shipments for container or below deck stowage. However, when it is determined that the use of a vessel of United States registry will not provide the required service, the TSP shall request permission to use a Foreign Flag vessel prior to start of shipment.

Requests for permission to use a Foreign Flag vessel shall be made to RTO on the form 'Request for Approval of Use of a Foreign Flag Vessel' (see Appendix C). Approval will be granted only when the TSP certifies in writing that US flag shipping is not available or the use of foreign flag shipping is necessary to meet delivery requirements.
(FAC ¶ 43, HTOS, Aug. 2010 Ed.)

Further, the HTOS provides detailed rate information relating to foreign flag vessels:

Adjustments in rates will be permitted when rate differentials are involved due to the use of Foreign Flag Shipping. A Justification Certificate (see Appendix C) is required for the use of a Foreign Flag vessel. When increases or decreases occur in rates due to the use of Foreign Flag Shipping, billing and documentation submitted in connection with the GBL shipment will have differences between the Foreign Flag vessel rate and the rate used in computing the accepted transportation single factor rate (SFR). The ocean freight bill which must be submitted to support each GBL and the rate will be adjusted in favor of the TSP or the Government on the basis of this bill.

(FAC ¶ 44.)

Further, the International HTOS Questionnaire that all aspiring TSPs must complete which reemphasizes the importance of these requirements, asks the following questions:

> 33.   When determined that the use of a vessel of the United States registry will not provide the required service, the participant will request permission to use foreign flag vessel prior to start of movement.  (TRUE)
>
> 100.  Adjustments in rates will not be permitted when rate differentials are involved due to the use of Foreign Flag Shipping.  (FALSE)

(FAC ¶ 45.) International HTOS Questionnaire, HHG International Application at https://www.gsa.gov/travel/agency-services/employee-relocation/household-goods-transportation/for-transportation-service-providers/approval-requirements .)

## B.   The Scheme

### 1.   Part One:  The submission of the low-ball bids.

As explained above, twice a year, TSPs can submit bids through the RFO process for an award of different shipping lanes (e.g., D.C to China, Miami to the United Kingdom, etc.)  (FAC ¶ 50.)  DOS has 225 embassies and consulates worldwide, therefore, there are thousands of lanes at issue.  One or more TSPs are awarded each lane.  Once a lane award is secured through GSA, DOS managers arranging an employee move are required to use one of the TSPs that have been awarded the lane.  (FAC ¶ 50.) The process is highly competitive and companies such as Defendants submit low-ball bids to capture the lane awards.  (FAC ¶ 51.) In fact, the rates submitted by Defendants are so low they could only be cost-effective if they intend to unlawfully use cheaper foreign flag cargo vessels.  (FAC ¶ 51.) Defendants have no intention of using the more expensive American carriers, knowing DOS will not audit the submissions.  (FAC ¶ 51.) Defendants, through the rigged bids, are awarded the most lucrative lanes and lock out law-abiding competition.  (FAC ¶ 51.)

The below examples of submissions to obtain lane awards highlight low-ball bidding practices for what is known as the surface, or "ocean-going" portion of the shipment lanes from Washington D.C. to London.  (FAC ¶ 52.) The fair market rate of transport for that portion of the

lane should have been approximately $7,200 at that time.  (FAC ¶ 52.) These fair market amounts are based on standard costs that all Defendants would be subject to.  (FAC ¶ 52.) There is very little variability between TSPs as far as the costs that they must incur for such shipments.  (FAC ¶ 52.)  This is because most of the work of the shipment is done by other companies—i.e., sub-contractors.  (FAC ¶ 52.)  Most notably, none of the TSPs have their own ocean shipping vessels, and therefore all must use the relatively small set of ocean shipping companies.

Despite this standard cost range of $7,200 for the Washington D.C. to London surface or ocean-going portion of the lane, the companies below submitted bids approximately **25% below** those market rates.  (FAC ¶ 53.)

With respect to Defendant Cartwright, for example, in 2019, it submitted a rate of $11,209 for the Washington D.C. to the United Kingdom lane.  (FAC ¶ 65.)  Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,730—significantly **more** than Cartwright's rate.  (FAC ¶ 65.) Cartwright <u>would only be able to make a profit</u> on a rate of $11,209 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost to $9,965. (FAC ¶ 65.)

In another example, Cartwright submitted a rate of $12,284 for the Washington D.C. to the United Kingdom lane.  (FAC ¶ 66.) Factoring in the use of a U.S. Flag carrier, the cost of shipment on this lane would be $15,315—significantly **more** than Cartwright's rate.   (FAC ¶ 66.) Cartwright <u>would only avoid losing money</u> on a rate of $12,284 if it knew in advance that it intended to use foreign flag carriers, which would lower its cost.  (FAC ¶ 66.)

### 2. Part Two:  Submission of fraudulent flag waivers.

In order to profit on the low-ball bids, Defendants needed to falsely certify the need to use foreign carriers, which are must cheaper, by submitting the required waiver form to DOS.  Pursuant to the laws cited above, and the GSA contract, each TSP certifies that the waiver request is accurate and truthful as submitted.  (FAC ¶ 70.) The guidelines and GSA contract make clear that foreign flag vessels are meant to be the rare exception to the rule requiring U.S. flag vessels.  "Approval will be granted only when the TSP certifies in writing that a U.S. flag carrier is unavailable or the

use of foreign flag shipping is necessary to meet delivery requirements." (FAC ¶ 71.) Defendant Cartwright and others relied on DOS's inability to audit these waivers so they could continue to use cheaper foreign vessels and secure lanes with low-ball bids. (FAC ¶ 72.) They knowingly submitted thousands of fraudulent waivers claiming U.S. flag vessels were not available, when in fact they were. (FAC ¶ 72.) As a result, law-abiding TSPs have been locked out of shipping lanes and have been unable to compete with these companies' unscrupulous practices.

Further evidence shows that Defendants abandoned the scheme for fear of DOS uncovering the fraud. In 2018, Relator and others began raising concerns about the fraudulent practices. (FAC ¶ 73.) As a result, DOS began reemphasizing the U.S. flag requirements during industry conferences and through DOS publications. (FAC ¶ 73.) On March 27, 2019, DOS held a mandatory TSP meeting. Emanuel (Manny) Hazel was introduced as the Manager of Foreign Flag Waivers, a newly created position amidst the crackdown to show DOS's recognition of the flagrant abuse of the CHAMP program through submission of fraudulent bids and waivers. (FAC ¶ 73.) In response, some Defendants have recently stopped carrying out the scheme in fear of a crackdown. The chart included at paragraph 74 of the FAC shows this shift—where some Defendant companies barely broke-even or made a minor profit after switching to U.S. flag vessels. Other companies' rates skyrocketed for fear of DOS uncovering the fraud. (FAC ¶ 74.)

Communication between top executives further evidences the fraud. In a late 2019 meeting between Dawn Fontano of Crown Moving and Daniel Johnson, Director of Customer Service at Defendant Worldwide Moving & Storage, New World Van Lines, Johnson admitted that New World had "lost a huge amount of money" since paring back their use of foreign flag vessels. Johnson admitted that abandoning the scheme impacted 40% of their international business. (FAC ¶ 79.)

### III.   LEGAL STANDARD

#### A.   The False Claims Act Must be Interpreted Liberally and Construed Broadly

The False Claims Act is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.... The Court has consistently refused to accept a

rigid, restrictive reading." *U.S ex rel. Sanchez v. Abuabara*, No. 10-61673-CIV, 2012 WL 254764, at *6 (S.D. Fla. Jan. 27, 2012) (citations and internal quotations omitted); *see also United States v. AJB*, No. CA 09-621-KDC, 2010 WL 3748249, *3 (S.D. Ala. Sept. 1, 2010), *report and recommendation adopted sub nom. United States v. AJB Liab. Co*., No. CIV.A. 09-00621-KD-C (S.D. Ala. Sept. 17, 2010) (quoting *United States ex rel. Loughren v. Unum Group*, 613 F.3d 300 (1st Cir. 2010) ("The FCA 'covers all fraudulent attempts to cause the government to pay out sums of money.'"); S. REP. NO. 111–10, at 10 (2009) (noting that the FCA is "[o]ne of the most successful tools for combating waste and abuse in Government spending," the "effectiveness" of which "has recently been undermined by court decisions limiting the scope of the law").

Indeed, the Act "has as its core function the promotion of transparency and honesty amongst government contractors." *United States v. Dynamics Research Corp.*, No. 03cv11965–NG, 2008 WL 886035, at *8 (D. Mass., March 31, 2008). The goal of the FCA generally is to ensure integrity in government contracting, and the statute embodies "the maxim that [people] must turn square corners when they deal with the Government." *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6th Cir. 1989).

### 1. The Eleventh Circuit standard for False Claims Act complaints under Rule 12 and Rule 9.

The Eleventh Circuit has stated that Rule 9(b) serves an important purpose in fraud actions in part by alerting defendants to the precise misconduct with which they are charged. *Ziemba v. Cascade Int'l., Inc*., 256 F.3d 1194, 1202 (11th Cir. 2001). "The application of Rule 9(b), however, *must not abrogate the concept of notice pleading*." *Ziemba*, 256 F.3d at 1202 (citations omitted) (emphasis added); *see also Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010) ("To survive a Rule 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations ... but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."). The "Court must not allow the application of Rule 9(b) to vitiate the overall concept of notice pleading." *Associated Indus. Ins. Co. v. Advanced Mgmt. Servs., Inc*., No. 12-CV-80393-KAM, 2013 WL 1149668, *8 (S.D. Fla. Mar. 19, 2013) (citation omitted).

"The Eleventh Circuit evaluates 'whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis.'" *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 Fed. Appx. 693, 704 (11th Cir. 2014) (citations omitted). "Providing exact billing data—name, date, amount, and services rendered-or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted. . . However, *there is no per se rule that an FCA complaint must provide exact billing data* or attach a representative sample claim." *Mastej*, 591 Fed. Appx. at 704 (emphasis added); *see also Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule.")

Indeed, the Rule 9(b) particularity requirement "must be read in conjunction with Federal Rule of Civil Procedure 8's directives that a complaint need only provide a short and plain statement of the claim," and courts considering motions to dismiss for failure to plead fraud with particularity "should always be careful to harmonize the directives of [R]ule 9(b) with the broader policy of notice pleading found in Rule 8." *Hill v. Morehouse Medical Associates, Inc.*, No. 02–14429, 2003 WL 22019936, *3 (11th Cir. Aug. 15, 2003) (citations and internal quotation marks omitted). In other words, the two pleading standards are considered together, such that "[i]n an action under the False Claims Act, Rule 8's pleading standard is *supplemented but not supplanted* by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan University*, 780 F.3d 1039, 1051 (11th Cir. 2015) (emphasis added).

Further, the Supreme Court has made clear that a complaint need only allege "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or allege sufficient facts to "raise a right to relief above the speculative level." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than

a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 672, 678 (2009) (quoting *Twombly*).[1]

## IV.    ARGUMENT

### A.    Relator Pleads Fraud with the Required Particularity

As stated above in Section III, the Eleventh Circuit has reiterated that while FCA cases must be pled with particularity, there is not an exact formula for what must be pled in each case. Indeed, *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308–09 (11th Cir. 2002), relied upon by Cartwright, provided examples of the types of information that might help a plaintiff plead the submission of a claim with particularity, yet cautioned that Rule 9(b) "does not mandate all of this information for any of the alleged claims."  *Id.* at 1312 and n.21.

### 1.    The "Who" and "What" Has Been Properly Pled

Relator has sufficiently pled "who" made the claims—multiple corporate defendants, including Cartwright, submitted or presented the false claims through the GSA.

Relator has also adequately alleged "what" occurred.  As the authorities Cartwright rely upon provide, Rule 9(b) requires that a FCA complaint contain "some indicia of reliability" that a false claim was actually submitted to the government. *Clausen*, 290 F.3d at 1311.  However, contrary to Cartwright's argument, exact billing data is *not* required to properly plead a violation

---

[1] Other circuits also have made clear the trend that the pleading standard for FCA cases must be liberal.  "If there are two alternative explanations, one advanced by defendant and the other advanced by Relator, both of which are plausible, Relator's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2101 (2012).  Accordingly, a relator "need not rule out all possible innocent explanations."  *In re Automotive Parts Antitrust Litigation*, 2014 WL 840272 (E.D. Mich. 2014).  For example, in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009), the Fifth Circuit held that "[t]he particular circumstances constituting the fraudulent presentment are often harbored in the scheme . . ." and the details of a scheme to submit false claims "paired with reliable indicia that lead to a strong inference that claims were actually submitted" are sufficient for stating an FCA claim.  Other circuits have followed suit.  *See, e.g., Ebeid v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010) ("We do not embrace the district court's categorical approach that would, as a matter of course, require a relator to identify representative examples of false claims to support every allegation . . . . [I]t is sufficient to allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.")

of 31 U.S.C. § 3729(a)(1)(A) or (a)(1)(B).  (*See* Motion to Dismiss at 8.)  As provided above in Section III, "[t]he Eleventh Circuit evaluates 'whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis.'" *Mastej*, 591 Fed. Appx. at 704 (citations omitted).

Indeed, "[p]roviding exact billing data—name, date, amount, and services rendered-or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted." *Id.* "However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." *Mastej*, 591 Fed. Appx. at 704; *see also Clausen*, 290 F.3d at 1312 & n.21 (listing some of the types of information that might help a plaintiff plead the submission of a claim with particularity but cautioning that Rule 9(b) "does not mandate all of this information for any of the alleged claims"); *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988) ("Allegations of date, time or place satisfy the Rule 9(b) requirement that the circumstances of the alleged fraud must be pleaded with particularity, but alternative means are also available to satisfy the rule."); *U.S. ex rel. Lockhart v. Gen. Dynamics Corp.*, 529 F. Supp. 2d 1335, 1341 (N.D. Fla. 2007) ("[O]ne cannot give the date of an event that did not happen, or identify the person who made a disclosure that was not made. The complaint specifically identifies the tests that were not conducted, and gives precise and credible information on how [Relator] knows what he alleges. This is sufficient to satisfy Rule 9(b).")

Under the Eleventh Circuit's nuanced, case-by-case approach, other means are available to present the required indicia of reliability that a false claim was submitted. "Although there are no bright-line rules, our case law has indicated that a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." *Mastej*, 591 F. App'x at 704–05; *see also U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir.2005) (holding that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ whose conversations about the defendant's billing practices

with the defendant's office manager formed the basis for the relator's belief that claims were actually submitted to the government).

Cartwright misses the mark and relies heavily on *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006), a case that, unlike here, involved highly individualized medical care decisions spanning multiple years, care providers, and patients.  (*See* Motion to Dismiss at 9-10.) The court there found that "[j]ust like the *Clausen* plaintiff, though, Atkins fails to provide the next link in the FCA liability chain: showing that the defendants [medical providers] actually submitted reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement." *Id.* at 1359.  *Atkins* is distinguishable, as the entire program at issue here is a government program.  Unlike healthcare, where there are a wide variety of potential payers involved, both private and governmental, the only potential payer at issue here is the United States Department of State.  Accordingly, there is no dispute that claims for reimbursement were submitted to the government.

Further, Cartwright's reliance on *U.S. ex rel. Seal 1 v. Lockheed Martin Corp.*, 429 F. App'x. 818, 820 (11th Cir. 2011) is inapposite.  (*See* Motion to Dismiss at 6.)  Unlike in that case, (where the alleged false claims were made in reference to individual coats of paint and, as such, required great particularity to allege or deny) the false claims at issue here are readily discernible in the form of patently unprofitable repeated low-ball bids that Relator has shown were submitted to the government, and subsequent routine submission of fraudulent flag waivers.  *Id.*  Unlike layers of paint, Defendants here can easily identify their fraudulent flag waivers—they are a relatively simple form (*see* FAC ¶ 41) that are undoubtedly maintained in Defendants' electronic systems.  Further, in *Lockheed*, unlike here, the contractual requirements and terms at issue were not pled.  *See id.*  As detailed above in Section II, unlike the cases Cartwright relies upon, Relator has provided detailed examples of what items were submitted, and the scheme behind the submissions.

Lastly, Cartwright confusingly raises the distinction between "factual" and "legal" falsity. (*See* Motion to Dismiss at 10.)  False claims under the FCA may assume a variety of forms. "A factually false claim occurs ... when a supplier submits a claim that misidentifies the goods supplied or requests reimbursement for goods that it never provided."  []  On the other hand, "[a] claim is legally false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *United States v. Marder*, 208 F. Supp. 3d 1296, 1312 (S.D. Fla. 2016) (citing *U.S. ex rel. Davis v. D.C.*, 793 F.3d 120, 124 (D.C. Cir. 2015)) (internal quotation marks omitted).  Legally false claims, otherwise known as false certifications, can "be either express or implied." *Id.* (citations omitted).

Here, as explained above, the submissions by Cartwright are both legally and factually false, and Cartwright's demand for market analysis exceeds the Rule 9(b) FCA requirements (*see* Motion to Dismiss at 11).[2]  In a case such as this, where the America-First policies are clear and explicit, and Defendants' certifications are express, there is no need for a confusing analysis of "legal falsity" or market analysis.

## 2.     The "How" Has Been Properly Alleged

As detailed in Section II above, the clear rules of the DOS (and GSA) have been violated. These rules are based on the "America-First" policy and nearly a century of maritime policy and regulation.  The Merchant Marine Act of 1936 provides the GSA authority to set forth regulations requiring agencies not to pay or reimburse an officer or employee for travel or transportation expenses associated with a foreign vessel unless documentation indicates the necessity to do so. *See* 46 U.S.C. § 55302(b); *see also* FAC ¶ 25.  The Cargo Preference Act of 1954 requires that: "at least 50 percent of the gross tonnage of all Government generated cargo -- meaning cargoes

---

[2] Cartwright claims Relator only alleges facts that support Defendants' false submissions by pointing to conduct after the "crackdown" by the DOS.  (*See* Motion to Dismiss at 11.)  This is not accurate.  Relator details the pattern of Defendants' submissions both before and after the DOS "crackdown."  (*See* FAC ¶¶ 52-69.)  Further, Cartwright misrepresents Relator's allegations pursuant to paragraph 74 of the FAC.  Relator does not allege all Defendants' rates skyrocketed. (*See* Motion to Dismiss at 5.)   Rather, Relator alleges that "some" Defendants "barely broke-even or made a minor profit," and "other Companies' rates skyrocketed."

procured, furnished, or financed by the United States Government -- shall be transported on privately owned, U.S.-flag commercial vessels to the extent such vessels are available at fair and reasonable rates. The 'at least 50 percent' requirement is applicable to the extent such vessels are available at fair and reasonable rates, as determined by the Maritime Administration." (The Cargo Preference Act of 1954 refers to Section 901(b) of the Merchant Marine Act of 1936, as amended in 46 U.S.C. § 1241(b), and codified in various subsequent documents 46 USC § 55305; 46 C.F.R. Part 381; *see also* FAC ¶ 26.) Indeed, the CHAMP Program includes cargoes that are subject to the Cargo Preference Act pursuant to 46 C.F.R. Part 381.2(b)(1), and (4). The Cargo Preference Act of 1954 is applied to and administered by all Federal departments and agencies (except the Department of Defense). *See* 46 C.F.R. Part 381.3. (FAC ¶ 27.)

Further, the Code of Federal Regulations clearly states that the preference for privately owned U.S. Flag vessels applies to contractors and subcontractors working with the U.S. government. *See* 48 C.F.R. Part 47.503(a)(1); FAC ¶ 28. Accordingly, specific federal regulations and laws have been violated by Defendants, establishing the "how."[3]

### 3. The "When" and "Where" are Properly Pled

The "when" has been specified as 2008-2018. The "where" pertains to the international routes of Defendants, including Cartwright as outlined above in Section II.

### B. The FAC Pleads the Requisite Element of Scienter

Rule 9 on its face does not apply to the scienter requirement of the False Claims Act. *See* Rule 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged

---

[3] Cartwright relies upon JK Moving & Storage Inc.'s analysis of "underbidding." (*See* Motion to Dismiss at n.7.) Cartwright, like JK Moving & Storage Inc., misses the mark in relying on "underbidding" cases. (*See* Motion to Dismiss, ECF No. 150 at 12-13.) This case is not premised only upon submission of a rate, but rather, improper certification of unavailability of U.S. carriers in securing government contracts—a material condition of awarding contracts and receiving payment from the DOS through the CHAMP program. The low-rate submissions evidence part of the scheme as outlined above, but unlike the cases JK Moving & Storage Inc., (and now Cartwright) rely upon, this case is not about the bids alone. As explained further below in Section IV, C, these certifications of unavailability were material to the government awarding contracts and issuing payment to the TSPs.

generally"); *see also United States ex rel. Dildine v. Pandya*, 389 F. Supp. 3d 1214, 1218 (N.D. Ga. 2019).  Further, the Eleventh Circuit has held that Rule 9(b) may be relaxed in FCA cases where the relator has personal knowledge of the fraudulent conduct or personally participated in it.  *See U.S. ex rel. Matheny v. Medco Health Sols., Inc*., 671 F.3d 1217, 1230 (11th Cir. 2012) ("[W]e are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct.")

### C.  Relator Has Sufficiently Alleged Materiality

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]."  *Universal Health Servs., Inc. v. United States*, *ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016).  An alleged violation of a statute generally does not require further facts to establish materiality.  *See, e.g., United States ex rel. Heller v. Guardian Pharmacy, LLC,* No. 1:18-CV-03728-SDG, 2021 WL 488305, at *16 (N.D. Ga. Feb. 10, 2021) ("In sum, the Court agrees with the position taken by the majority of courts to reach the issue and finds that Heller need not allege further facts to establish materiality beyond a facially plausible violation of the AKS.")

As outlined above, the "America-First" policy is longstanding, is codified in the statutes and regulations cited above, and noted in every contract for transport at issue in this case by the DOS and GSA. Further highlighting the mandate to use American vessels absent unavailability, there are significant penalties in place for TSPs when submitting bids and waivers, in addition to FCA liability.  (FAC 46.)  "An applicant shall submit an application in its own name for approval as a TSP.  A firm that on its own behalf or on behalf of an agent (a) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (b) makes any false, fictitious or fraudulent statement or representation; or (c) makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry on any part of the application or on any document furnished pursuant to this HTOS is punishable by fines, imprisonment, or both."  18

U.S.C. § 1001; *see also* HTOS, Aug. 2010 Ed. § 2.7. Accordingly, the allegations against Cartwright and the other Defendants are clearly material violations.

### D.    The Public Disclosure Bar is Not Applicable

#### 1.    Background

Despite its short-hand name, the FCA's public disclosure bar is not triggered by any public disclosure of any generalized information about potential violations of law. Even when the bar is implicated, an "original source" exception permits whistleblowers (like Relator) with significant information obtained independently of the relevant publicly disclosed information to proceed, because they "may still bring something of value to the table and thus deserve[] to benefit." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 373 (5th Cir. 2017).

The channels that trigger the public disclosure bar are very specific; the bar applies only

> if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i)      in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii)     in a congressional Governmental Accountability Office, or other Federal report, audit, or investigation; or
>
> (iii)    from the news media,
>
> unless . . . the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

#### 2.    No Relevant Public Disclosure Has Occurred

A disclosure occurs where (1) the disclosure at issue occurred through one of the channels specified in the statute as outlined above; (2) the disclosure was 'public'; and (3) the disclosure involves substantially the same allegations or transactions as alleged in the action or claim. *See* 31 U.S.C. § 3730(e)(4).  Here, none of the requirements can be met.

Cartwright assumes, rather than shows, that Relator's allegations are based on information that was publicly-disclosed within the meaning of the FCA. Cartwright alleges that because the

bids are submitted and maintained on a GSA system (TMSS 2.0), they fall within the statute's category of information that has been disclosed as a "report," and relies upon JK Moving & Storage's argument.  (Motion to Dismiss at 14-15, n.9).

However, the cases relating to "reports" are inapposite.  First, the system is a cloud-based application specifically engineered to help customers meet transportation needs as an advanced management tool.  The portal (which Cartwright and JK Moving & Storage cite) in fact states, "[t]his is a U.S. General Services Administration Federal Government computer system that is 'FOR OFFICIAL USE ONLY.'" (Emphasis in original.)  Therefore, the portal is not a "report" as contemplated by the public disclosure bar.  Moreover, fatal to Defendants' argument, unlike the cases cited, the GSA TMSS 2.0 system is not accessible to the public.  The Portal requires login credentials and is designed for CHAMP participants.  Finally, the FAC references the portal to highlight the bid submissions; but using the portal to highlight a part of the scheme does not qualify as the same "allegations or transactions" in the complaint.  Defendants' systematic submission of false foreign flag waiver certifications has not been made public or quasi-public in any manner.[4]

---

[4] After the 2010 amendments, the Eleventh Circuit, along with other circuits, held the bar is no longer jurisdictional.  *U.S. ex rel. Osheroff v. Humana Inc*., 776 F.3d 805, 810 (11th Cir. 2015) ("We conclude that the amended § 3730(e)(4) creates grounds for dismissal for failure to state a claim rather than for lack of jurisdiction. The plain language of the new provision commands this interpretation: it instructs courts to dismiss an action when the public disclosure provision applies.) Accordingly, challenges based on the post-2010 provision should be evaluated under the highly deferential standards of Rule 12(b)(6).  *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3rd Cir. 2016) (reversing district court which should have decided public disclosure bar motion under Rule 12(b)(6)).

The 2010 amendments also materially changed the original source definition.  Previously, a relator needed "direct and independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4) (1986).       Congress removed the "direct" knowledge requirement, and the statute now requires only "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." *Id.* § 3730(e)(4)(B) (2010). Additionally, post-amendment the bar only applies to "federal" court or administrative proceedings.  *See Osheroff*, 776 F.3d at 812. Here, neither version of the public disclosure bar is applicable.  In any event, even if somehow Cartwright could argue the GSA "Features of TMSS 2.0" could qualify as a public disclosure, Relator is an original source as an insider in the industry with details relating to the schemes of fraudulent submissions.

## V.      CONCLUSION

For the foregoing reasons, Relator respectfully requests the Court deny Cartwright's Motion to Dismiss, or alternatively, grant leave to amend.


Dated: August 31, 2021                    Respectfully submitted,

                                          /s/ Ryon McCabe
                                          Ryon McCabe (FL 009075)
                                          rmccabe@mccaberabin.com
                                          MCCABE RABIN, P.A.
                                          1601 Forum Pl #201
                                          West Palm Beach, FL 33401
                                          Telephone (561) 659-7878

                                          COTCHETT, PITRE & MCCARTHY, LLP
                                          Justin T. Berger (*admitted pro hac vice*)
                                          Sarvenaz J. Fahimi (*admitted pro hac vice*)
                                          San Francisco Airport Office Center
                                          840 Malcolm Road
                                          Burlingame, CA 94010

                                          LAW OFFICES OF PAUL PELLETIER
                                          Paul E. Pelletier (*admitted pro hac vice*)
                                          3500 Morningside Drive
                                          Fairfax, VA 22031

                                          *Attorneys for Relator Sedona Partners LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on August 31, 2021 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of a Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>/s/ Ryon McCabe</u>
Ryon McCabe (FL 009075)

## <u>SERVICE LIST</u>

**UNITED STATES OF AMERICA ex rel. SEDONA PARTNERS LLC,**
v.
**ABLE MOVING & STORAGE, INC., et al.**

**Case No. 20-CV-23242-BLOOM/Louis**
**U.S. District Court, Southern District of Florida**

James A. Weinkle
Assistant United States Attorney
Office of the United States Attorney
Southern District of Florida
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
James.Weinkle@usdoj.gov
*Counsel for United States of America*

Robert Harris
rharris@stackfernandez.com
gmartich@stackfernandez.com
Sammy Epelbaum
sepelbaum@stackfernandez.com
Stack Fernandez & Harris, PA
1001 Brickell Bay Drive, Ste. 2650
Miami, FL 33131
*Counsel for Paxton Van Lines, Inc.*

Stuart A. Berman
saberman@lerchearly.com
Lerch, Early & Brewer, Chtd.
7600 Wisconsin Avenue, Ste. 700
Bethesda, MD 20814
301.657.0729
*Pro Hac Vice Paxton Van Lines, Inc.*

Christopher W. Wadsworth,
cw@wmd-law.org
pleadings@wmd-law.org
Wadsworth, Margrey & Dixon, LLP
261 NE 1st Street, 5th Fl.
Miami, FL 33132
305.777.1000
*Counsel Able Moving & Storage, Inc.*

Matthew J. Landley
mlangley@beneschlaw.com
Benesch, Friedlander, Coplan & Aranoff,
LLP
71 South Wacker Drive, Ste. 1600
Chicago, IL 60606-4637
312.212.4949
*Counsel for DeWitt Companies Limited, LLC*

Stephen Chahn Lee
slee@beneschlaw.com
Benesch, Friedlander, Coplan & Aronoff,
LLP
71 S. Wacker Drive, Ste. 1600
Chicago, IL 60606
312.624.6361
*Pro Hac Vice DeWitt Companies Limited,
LLC*

Michael B. Silverstein
msilverstein@beneschlaw.com
Benesch, Friedlander, Coplan & Aranoff,
LLP
41 South High Street, Ste. 2600
Columbus, OH 43215
614.223.9362
*Pro Hac Vice DeWitt Companies Limited,
LLC*

22

Barry A. Postman
Barry.postman@csklegal.com
Sara.ghent@csklegal.com
Justin C. Sorel
Justin.sorel@csklegal.com
Loren.ryan@csklegal.com
Cole, Scott & Kissane, P.A.
222 Lakeview Avenue, Ste. 120
West Palm Beach, FL 33401
*Counsel for Hilldrup Companies, Inc.*

Maura K. Monaghan
mkmonaghan@debevoise.com
Melanie M. Burke
mburke@debevoise.com
Kristin D. Kiehn
kdkiehn@debevoise.com
Debevoise & Plimpton LLP
919 Third Ave.
New York, NY 10022
*Pro Hac Vice Hilldrup Companies, Inc.*

R. Eric Bilik
ebilik@mcguirewoods.com
Sean P. Walsh
swalsh@mcguirewoods.com
McGuire Woods, LLP
50 North Laura Street, Ste. 3300
Jacksonville, FL 32202-3661
904.798.3200
*Counsel for J.K. Moving & Storage, Inc.*

Andrew M. Gordon
agordon@hinshawlaw.com
Hinshaw & Culbertson, LLP
One East Broward Blvd., Ste. 1010
Ft. Lauderdale, FL 33301
954.467.7900
*Counsel for New World Van Lines, Inc.*

Brian R. Zeeck
bzeeck@hinshawlaw.com
Hinshaw & Culbertson, LLP
151 North Franklin Street, Ste. 2500
Chicago, IL 60606
312.704.3028
*Pro Hac Vice New World Van Lines, Inc.*

Craig B. Shapiro
cshapiro@belaw.cc
Buchbinder & Elegant, P.A.
46 S.W. 1st Street, 4th Fl.
Miami, FL 33130
305.358.1515
*Counsel for Western Express Forwarding, LLC*

Thomas F. Murphy tmurphy@dclawfirm.com
Friedlander Misler, PLLC
5335 Wisconsin Avenue, NW
Ste. 660
Washington, DC 20015
202.872.080
*Pro Hac Vice Western Express Forwarding, LLC*